# EX PARTE WILLIAM R. NELSON, Petitioner.

## In Banc, June 2, 1913.

1. **CONTEMPT. Unambiguous Publication: Testimony of Intent.** Where a publication is unambiguous and clearly constitutes contempt, the publisher is conclusively presumed to have meant what the publication on its face clearly means, and no parole testimony to show the intention of the writer and publisher is admissible.

2. ————: ————: ————: **In Mitigation of Punishment.** But testimony of the writer of the article that he had no malice towards the court or judge to whom the contempt was imputed, and testimony of the publisher of the newspaper that he had no knowledge of the existence of the article until after its publication, is admissible in mitigation of the punishment that should be imposed for the offense committed. The publication being in defamation of the court and therefore an injury to the State, and no damages being recoverable, although constituting contempt *per se*, the rule is not the same as it is in libel *per se*, where such evidence is not admissible, either in mitigation or justification.

3. ————: **In Reference to Case Pending.** A dismissal of a divorce suit upon condition that defendant pay the fees allowed plaintiff's attorneys, is a conditional dismissal, and is a case pending if concerning the act of the court in dismissing it defendant publishes a contemptuous article.

4. ————: **True as to Another Judge.** A contemptuous and untrue publication made of and concerning the judge of one division of the circuit court does not become less so because true of the judge of another division. Besides, in this case the contemptuous charge was not true of the judge of the other division.

5. ————: **Constructive: Condemned Without Hearing.** The publisher of a newspaper, in which was published the contemptuous article concerning the judge of the circuit court written by another, is guilty only of constructive contempt, and cannot be punished for said contempt without a hearing. To deny him a hearing is to deny him the due process of law guaranteed by the Constitution. Where defendant was cited for contempt and appeared and filed his answer, asserting the publication was true and denying it was contemptuous, and the case was set for the next day, and during the night the judge wrote out his opinion finding defendant guilty and

fixing his punishment, reserving the contingent right to modify them if defendant could convince him that they were improper, and when the hearing was called stated that he made up his mind the night before that no testimony could be offered to prove the truth of the article and refused to permit defendant to introduce any testimony in support of the allegations of his return, and proceeded to read the findings, judgment and sentence prepared the night before, defendant was in fact tried and condemned the night before in his absence, and although the article is held to be contemptuous on its face, the proceeding resulted in denying to defendant due process of law, that is, a hearing according to the law of the land; and, hence, defendant is discharged on *habeas corpus.*

## Habeas Corpus.

PETITIONER DISCHARGED.

*Frank P. Walsh, E. R. Morrison* and *James P. Aylward* for petitioner.

(1)   Petitioner was deprived of his constitutional rights by the decision of Judge Guthrie, rendered without a hearing, and by the refusal to permit the introduction of competent evidence in his defense. In re Clark, 208 Mo. 147; Paving Co. v. Ridge, 169 Mo. 384; McClatchy v. Superior Court, 119 Cal. 413, 39 L. R. A. 692; State ex rel. v. Judges, 32 La. Ann. 1261; Cabinet Co. v. Russell, 250 Ill. 416; Hovey v. Elliott, 167 U. S. 407; Mylus v. McDonald, 10 L. R. A. (W. Va.) 198; McGehee on Due Process of Law, p. 73. (2) An inadvertent and unintentional misstatement of fact, or apparent misstatement, is not punishable as a criminal contempt, especially where, as here, the statement is true as to another division of the same court. McClatchy v. Superior Court, 119 Cal. 413; 9 Cyc. 22; In re Stewart, 3 Scam. (Ill.) 402; In re Prior, 18 Kan. 72; 3 Ency. Ev., pp. 449, 463; People v. Aitken, 19 Hun, 327; 7 Am. & Eng. Ency. Law (2 Ed.), p. 74; In re Deaton, 105 N. C. 59; Rapalje on Contempt, sec. 121; State ex rel. v. Allen, 235 Mo. 298. (3) To constitute contempt, the

publication, in a case of indirect contempt, must be in reference to a pending cause. 7 Am. & Eng. Ency. Law (2 Ed.), p. 61; State v. Ashbaugh, 97 Wis. 1, 38 L. R. A. 554; Board of Law Examiners v. Hart, 104 Minn. 115; State v. Kaiser, 20 Ore. 50, 8 L. R. A. 584; State v. Publishing Co., 60 Neb. 282, 50 L. R. A. 195; Cheadle v. State, 110 Ind. 301; State v. Sweetland, 3 S. D. 503; Dunham v. State, 6 Iowa, 256; King v. Freeman's Journal, 2 Ir. Rep. 82; McLeod v. St. Aubyn, 68 L. J. P. C. (N. S.) 137. (4) The statements published do not constitute a contempt, and if there was no contempt then petitioner should be discharged. Ex parte Creasy, 243 Mo. 679.

*Ed. E. Yates, O. H. Dean* and *Willard P. Hall* amici curiae.

(1) It was not necessary for the rule or citation to allege that the publication was false. The rule was issued to compel respondent to show cause why he should not be punished for contempt in making such publication. This implied that the publication was false and required respondent to plead its truth if he relied upon that fact as a justification and defense. The rule set out the article in full. This was sufficient. If false, the publication constituted contempt. If the publication was true, it was incumbent on respondent to plead and prove it. Sheppard Case, 177 Mo. 229. It is not customary for the rule to show cause to allege that the publication is false. People v. Wilson, 64 Ill. 195. Appearance of respondent in response to the rule to show cause waived any defect therein or in the manner of its service. Petitioner was deprived of no legal right by Judge Guthrie preparing his written opinion prior to the formal hearing before him. Judge Guthrie prepared his written opinion after a careful examination and consideration of petitioner's return

251 Mo.—5

to the rule to show cause. Such examination and consideration resulted in Judge Guthrie reaching the conclusion that the return admitted the contempt, that is to say, that the return admitted the publication and stated no defense for having made the publication. As Judge Guthrie conceived the case to be, the gravamen of the contempt charged against Nelson lay in those parts of the publication which stated that Judge Guthrie had decided that attorneys' fees must be paid before alimony, and that in a case before him he had permitted the woman's lawyer asking for a fee to decide that he should be paid his fee and that she should have no alimony. The publication clearly attributed this conduct to Judge Guthrie. The defense offered in the answer was that that publication did not attribute this conduct to Judge Guthrie, that the publication did not intend to do so, and that in fact another judge, to-wit, Judge Lucas, was guilty of the conduct, and that the publication being true as to Judge Lucas could not be contempt against Judge Guthrie, because both judges were judges of the same court. All these defenses, except the allegation that Judge Lucas was guilty of the conduct mentioned, raised questions of law, and regardless of the question of what Judge Lucas had done, Judge Guthrie reached the conclusion that none of the defenses was maintainable. Judge Guthrie concluded (a) that the divisions of the Jackson Circuit Court were separate and distinct entities; (b) that a contempt against one division was not a contempt against other divisions; (c) that the publication clearly charged the reprehensible conduct against Division One and himself as the judge thereof: (d) that, therefore, regardless of petitioner's intention, in fact, the law conclusively presumed that he intended to say what the publication in fact did say; (e) that for this reason the defense that petitioner did not intend in fact to charge him with the reprehensible conduct was unavailing; (f) and that it was wholly immaterial that

Judge Lucas had been guilty of said conduct. All these conclusions were drawn from the face of the rule to show cause and the return to it. If these conclusions were sound; if they were just; if they were correct; what legal injury was done to petitioner by Judge Guthrie by reducing the conclusions to written form prior to the hearing of the arguments of petitioner's counsel? The conclusions were tentative and not final. Writing them down did not make them permanent. Written, they were no more permanent than before they were written. They were still subject to change and modification, if shown to be wrong by the arguments of petitioner's counsel. If correct, they should not have been changed. Therefore, the question is as to the correctness of Judge Guthrie's conclusions, and not as to when they were reached, or as to when they were written. Petitioner stated his defense in the return. If, in law, the return constituted no defense, Judge Guthrie deprived him of no legal right by so deciding. A just and sound judgment against petitioner denied him no legal right. (2) Judge Guthrie was right in ruling that the divisions of the circuit court of Jackson county were separate and distinct entities, that contempt against one division was not contempt against any other division, and that it was no defense to the charge that petitioner had committed contempt against Division One by publishing that said division had decided that lawyers must be paid before alimony, etc., to say that Division Two had so decided. State ex rel. v. Woodson, 86 Mo. App. 253; State v. Callaway, 154 Mo. 91; Priddy v. Boice, 201 Mo. 309; Eudaley v. Railroad, 186 Mo. 399; Guy v. Railroad, 197 Mo. 174; 40 Cyc. 180. Now a change of venue will not be granted in a contempt proceeding, for the reason that every court is the exclusive judge of contempts against its authority, and no court can punish a contempt of another court. Sheppard Case, 177 Mo. 229; Crook v. People, 16 Ill. 534; State ex rel. v. Bland, 189 Mo. 207.    (3)    The

publication's reference to Judge Guthrie was clear and unambiguous, and, therefore, no evidence was admissible to show that it was not intended to refer to him or that such reference was a mistake. Hayes v. Press Co., 127 Pa. St. 642; Lawson v. Watkins, 61 Minn. 137; Dorr v. United States, 195 U. S. 138; Clement v. Moore, 7 Moore C. Pl. (Eng.) 200. (4) Neither was such evidence admissible upon the theory that it was necessary to prove that petitioner intended to commit a contempt against Judge Guthrie in order to find him guilty of such contempt. Where the publication is unambiguous and clearly constitutes contempt, the intent is conclusively presumed. The publisher is conclusively presumed to mean what the publication clearly states. Fishback v. State, 131 Ind. 314; In re Wooley, 11 Bush (Ky.), 109; The People v. Frees, 1 Caines (N. Y.) 485; Rapalje on Contempt, secs. 55, 131; In re Chadwick, 109 Mich. 588; People v. Wilson, 64 Ill. 195; Sturoe's Case, 48 N. H. 428; Newspaper Co. v. Commonwealth, 172 Mass. 294. (5) It is the settled law in Missouri and it is also the law quite generally in the other States of this country that attorneys are regarded as officers of the courts, and that the attorneys for women in divorce suits, under proper circumstances, will be allowed reasonable compensation against the husbands, and protected in the collection of said fees just as are other officers of the courts protected in the collection of their costs. Isbell v. Weiss, 60 Mo. App. 4; Waters v. Waters, 49 Mo. 386; Hamilton v. Salisbury, 133 Mo. App. 718. Though the allowance is in favor of the wife as part of her alimony, it is for the benefit of her attorney. He moves for the allowance. People ex rel. v. District Court, 21 Colo. 251. This rule is not peculiar to Missouri, it prevails quite generally in the States of this Union. Courtney v. Courtney, 4 Ind. App. 221; Davis v. Davis, 141 Ind. 367; Weaver v. Weaver, 33 Ga. 172; Louden v. Louden, 65 How. Pr. (N. Y.) 411; Lamy v. Catron, 5 N. M. 373; Bur-

gess v. Burgess, 5 Dev. (Ky.) 228; Thorndike v. Thorndike, 1 Wash. (Terr.) 175; Thornberry v. Thornberry, 2 J. J. Marsh (Ky.), 325; Williams v. Monroe, 18 T. B. Mon. (Ky.) 515; Ballard v. Carpenter, 2 Met. (Ky.) 412. (6) This publication was a contempt because it related to the Clevinger case which was then, and still is, pending undisposed of, and tended to impede, embarrass and obstruct the final disposition of said case. Cummings v. Bennett, 8 Paige, 79; Simpson v. Brewster, 9 Paige, 246; Saxton v. Stowell, 11 Paige, 526.

WOODSON, J.—This is a proceeding by *habeas corpus,* instituted by the petitioner, William R. Nelson, the owner and publisher of the Kansas City Star, seeking to be released from the custody of the sheriff of Jackson county, who deprives him of his liberty under and by virtue of a commitment issued on a judgment rendered in Division No. 1 of the circuit court of said county, adjudging him guilty of contempt of court for printing and publishing in said paper, on January 26, 1913, a scurrilous and contemptuous article of and concerning said court, and of Judge Joseph A. Guthrie, the judge thereof, regarding certain rulings made by said court on January 25, 1913, in the case of Minnie L. Clevinger v. Claud F. Clevinger, duly pending therein.

The facts of the case are substantially as follows:

At all the times mentioned herein Judge Guthrie was the duly elected, qualified and acting judge of the circuit court of Jackson county, and was at the January term thereof assigned to and was occupying the bench and discharging the duties of said judge in Division No. 1 of said court.

That term began on January 13th, and ended March 8th of that year. At that time there was pending in said division of said court, the divorce suit of Clevin-

ger v. Clevinger, previously mentioned, in which the wife was the plaintiff. Her attorneys filed a motion therein, asking the court to allow them a reasonable sum as attorneys' fees for their services performed therein; and at the same time there was pending in said division a written motion signed by the plaintiff, asking that the case be dismissed, which was, by counsel for defendant, presented to the court.

The latter motion was contested, evidence heard and after due consideration, the court, on January 25, 1913, made and entered in said cause the following order (caption and formal entries omitted):

"Now on this day the motion of House and Manard and W. J. Allen for an allowance for attorneys' fees in this cause is taken up, submitted to the court, and after being fully advised in the premises said motion is by the court sustained to the extent of allowing said attorneys the sum of sixty dollars for their services as attorneys for plaintiff in this cause.

"And it appearing to the court that plaintiff has filed a written request that this cause be dismissed, it is ordered by the court that upon the payment of said sum of sixty dollars to the clerk of this court, to be used for the purpose of paying the attorneys, the amount allowed for their services herein on behalf of plaintiff, that this cause be dismissed.

"It is further ordered by the court that defendant pay the costs incurred by said motion for allowance of attorneys' fees herein."

The Kansas City Star is a daily newspaper published in Kansas City, owned and edited by the petitioner, William R. Nelson. The Star is published in the afternoon of every day except Sunday, on which day it is published in the morning.

On Sunday morning, the 26th day of January, 1913, the day after said order was made in the Clevinger case, there was printed and published in the Kansas City Star an article of which the following is a copy:

### PAY FEES BEFORE ALIMONY.
### THE LAWYERS MUST COLLECT FIRST
### JUDGE GUTHRIE DECIDES.

*Three Attorneys Awarded $60 Each in a Suit for Divorce Which Never Came to Trial—Reversed a Former Ruling by Judge Goodrich.*

If a woman brings a suit for divorce the case cannot be dismissed in the circuit court until the husband has paid her attorney his fee. Judge Guthrie made that ruling yesterday in favor of the divorce lawyers in the suit of Minnie Clevinger against Claud F. Clevinger.

After Mrs. Clevinger filed her suit her attorney filed a motion asking the court to allow her alimony and attorney's fee. When the motion was called a few days ago. Mr. Clevinger appeared in court with a request signed by his wife that the suit be dismissed, as she wanted neither alimony nor attorney's fee.

### FEES CLAIMED BY THREE.

Her attorneys insisted that they be allowed their fee before the case was dismissed and asked that Mr. Clevinger be required to pay it, even though the wife desired to dismiss the suit. Judge Guthrie gave them a judgment for $40 against Mr. Clevinger. Then another attorney, making three attorneys in all, came into court and said he also represented Mrs. Clevinger. The matter was reopened on another motion and Judge Guthrie made an order yesterday increasing the allowance to the attorneys from $40 to $60. The new order provides that the suit cannot be dismissed by Mrs. Clevinger until the attorneys have been paid. Mr. Clevinger's attorney insisted that a claim for attorneys' fees in divorce suits was no more binding than suit to collect grocery bills or any other claims. Judge Guthrie decided differently. He also proved that the wife's suit was without merit.

In a similar proceeding recently the judge told the attorney that the man was not able to pay both attorneys' fee and alimony to the wife.

### THE LAWYER DECIDED.

"Now which shall I allow," the court asked of the lawyer, "the alimony to the woman or the fee to you?"

"Just make the judgment for the fee," the attorney requested, and the order was so made.

Judge Goodrich decided several months ago that a wife could dismiss her divorce suit at any time, regardless of whether the atorneys' fee had been paid. He refused to require the husband to pay the fee after a reconcilation had been effected. Judge Guthrie reversed Goodrich's decision and there can be no reconciliations until lawyers have been paid. It is an important ruling in favor of the divorce lawyers.

Thereafter, on January 28, 1913, Judge Guthrie, as Judge of Division No. 1 of said court, issued against Mr. Nelson a rule to show cause, or citation, in words and figures as follows, to-wit:

"In the Circuit Court of Jackson County, Missouri, at Kansas City. In Re William R. Nelson.

"It appearing to the court that one William R. Nelson, as editor, owner and publisher of a certain daily and weekly newspaper called the Kansas City Star, and published in Kansas City, Missouri, on Sunday, the 26th day of January, 1913, published in said paper the following article:"

Then follows a copy of the article previously copied from the Star.

Continuing, the citation or rule to show cause, states:

"And Whereas, at the time said article was published the cause of Minnie L. Clevinger versus Claude F. Clevinger, referred to in the foregoing article, was pending in this court on a motion by the attorneys for the plaintiff for an allowance for their services as such attorneys:

"And Whereas, by said article, and particularly the headlines thereof, as follows: 'Pay Fees Before Alimony,' 'The Lawyer Must Collect First,' and the following words in the body thereof: 'In a similar proceeding recently the judge told the attorney that the man was not able to pay both attorney's fee and alimony to the wife.

" 'The Lawyer Decided.

" ' "Now which shall I allow" the court asked of the lawyer, "the alimony to the woman or the fee to you?" "Just make the judgment for the fee," the attorney requested, and the order was so made;' this court is charged with the wrongful and degrading act of expressing a willingness to decide and in fact deciding, an issue in a pending cause as the court was told

to do by an interested attorney, rather than by what the court conceived to be the right and justice of the matter; and is also charged with the wrongful, unjust and oppressive act of deciding that a husband, party to a suit for divorce, who was unable to pay a lawyer his fee, and at the same time provide for his wife, should pay the fee and thereby neglect his wife.

"And it appearing to the court that you, the said William R. Nelson, by said article aforesaid, published in said Kansas City Star, did defame and insult the Circuit Court of Jackson county, Missouri, and did charge its Presiding Judge with subserviency, and that said action in publishing said article tends to bring this court, and the judge thereof, into disrepute, and contempt, and tends to destroy the respect of the people for the law of the land, by breaking down their faith in the courts, by which, if at all, it must be administered:

"Now Therefore, it is ordered that you, the said William R. Nelson, be, and you are hereby commanded to be, and appear before the Honorable Circuit Court of Jackson County, at Kansas City, Missouri, in Division Number One thereof, on the 31st day of January, 1913, at nine o'clock in the forenoon thereof, at the County Court House in said Kansas City in the County of Jackson, then and there to show cause, if any you have, why an attachment should not issue against you for the contempt of this court, in publishing said article aforesaid.

"And it is ordered that a copy of this order be served in person upon the said William R. Nelson."

On January 31, 1913, Mr. Nelson filed his return to the rule to show cause. The return was in words and figures as follows, to-wit:

"In the Circuit Court of Jackson County, Missouri, Kansas City. In Re v. William R. Nelson.

## "Return of Respondent.

"And now comes William R. Nelson, in obedience to the command of this honorable court heretofore made upon him upon the 28th day of January, 1913, and for this his return to the order to show cause why an attachment should not issue against him for contempt of this court, says:

## "I.

"That the citation filed herein does not state facts sufficient to charge the respondent with a contempt of court and is not verified or supported by proper information as the law requires.

## "II.

"Because the citation shows upon its face that the publication set forth therein does not defame or insult the Circuit Court of Jackson County, Missouri, nor does it charge its presiding judge with subserviency, favoritism and unfairness in the discharge of his official duties, nor does said publication tend to bring this court and the judge thereof into disrepute and contempt, nor does it tend to destroy the respect of the people for the law of the land, by breaking down their faith in the courts, nor does said publication charge the court with the wrongful and degrading act of expressing a willingness to decide, and in fact deciding, an issue in a pending cause as the court was told to do by an interested attorney, rather than by what the court conceived to be the right and justice of the matter, nor does it charge the court with the wrongful, unjust and oppressive act of deciding that a husband, party to a suit for divorce, who was unable to pay a lawyer his fee, and at the same time provide for his wife, should pay the fee and thereby neglect his wife, as set forth in said citation herein, nor was it intended by the writer thereof, or this respondent, to so do, charge or be understood by the readers thereof.

## "III.

"Respondent admits that he is the editor, owner and publisher of a certain daily and weekly newspaper, called the Kansas City Star, published in Kansas City, Missouri, and admits that on Sunday, the 26th day of January, 1913, there was published in said newspaper the article set forth in the citation and complaint herein filed.

## "IV.

"Respondent says that the said newspaper article set forth in said citation and complaint, and which reads as follows:"

(Then follows a copy of the article previously set out.)

The return proceeds as follows:

" . . . is true in substance and in fact, but that said portion of said article does not set forth or charge that said occurrence took place before the Honorable Joseph A. Guthrie, Judge of Division No. 1, of the Circuit Court of Jackson County, Missouri, nor does said portion of said article aforesaid, set forth or charge that the order referred to therein was made and entered of record by the Honorable Joseph A. Guthrie, Judge of Division No. 1, but on the contrary, this respondent avers the fact to be that the said occurrence did occur before Honorable O. A. Lucas, Judge of Division No. 2, of the Circuit Court of Jackson County, Missouri, and the order referred to in said portion of said newspaper article hereinbefore mentioned was made and entered of record by the Honorable Judge last aforesaid, on the 10th day of January, 1912, in the case of Burton C. White against Tessie P. White.

"And respondent further says that it was not intended either by the matter set forth in the head lines of said article or that portion of said article herein last referred to, to state that said occurrence took place be-

fore the Honorable Joseph A. Guthrie, or that said order last aforesaid was made by him.

## "VII.

"Respondent avers that the judge of Division No. 1 has no jurisdiction, power or authority to either try or determine the alleged contempt growing out of the publication of that portion of the newspaper article, as follows, to-wit:

" 'In a similar proceeding recently the judge told the attorney that the man was not able to pay both attorneys' fee and alimony to the wife.

" 'The Lawyer Decided.

" ' "Now which shall I allow," the court asked the lawyer, "the alimony to the woman or the fee to you?"

" ' "Just make the judgment for the fee," the attorney requested, and the order was so made,' for the reason that said portion of said article does not charge that the occurrence took place before said judge, or that said order was made or entered by him, nor was said article intended so to charge.

## "VIII.

"That the publication set forth in said citation is, and was, a fair, just and reasonable comment upon the proceedings mentioned therein, and does not constitute a contempt.

## "IX.

"Respondent avers that any order adjudging respondent guilty of contempt for the publication of the newspaper article set forth in said citation would be in violation of section 14 of article 2 of the Constitution of the State of Missouri, in that it would deny the respondent the right of freedom of speech and the right to write and publish whatever he will on any subject, which said section is specially invoked herein.

## "X.

"That any order adjudging respondent guilty of contempt would be in violation of section 1 of article 14 of the Amendments of the Constitution of the United States, in that it would deprive this respondent of his liberty and property without due process of law, and deny to this respondent the equal protection of the laws of the State of Missouri all of which constitutional provisions are specially invoked herein.

"Wherefore, respondent prays that this complaint be dismissed, that the said citation and rule as against him may be discharged, and that he be permitted to go hence without day."

(Which was properly signed and sworn to.)

Said contempt proceeding was by agreement set down for hearing by the court, in Division No. 1, thereof, on February 1, 1913.

Said hearing resulted in a conviction of Mr. Nelson, and the record of which is as follows (formal parts omitted):

"Now on this day comes the said William R. Nelson in person and by his attorney, Frank P. Walsh, in obedience to the citation heretofore issued by this court, citing him to appear and show cause why he should not be adjudged in contempt of this court. And comes Edward E. Yates as friend of the court in this proceeding, and comes also O. H. Dean, who is now appointed by the court as friend of the court in this proceeding; and the said Edward E. Yates asks leave of court, and leave of court is granted, to amend the original citation herein by interlineation by inserting in said citation on the 2nd page thereof, after the word 'insult' the following words:

" 'The Court and Judge of Division One of.'

"And said amendment is now made. To which ruling of the court in permitting said amendment to be made, respondent excepted.

"By leave of court, said respondent amends his return herein, by interlineation by inserting on the first page thereof after the word 'Missouri' the following words:

"'Now the judge of Division Number 1 thereof.'

"And the trial of this cause is now proceeded with.

"After hearing the evidence and arguments of counsel and being fully advised in the premises, it is ordered and adjudged by the court as follows, to-wit:

"In the Circuit Court of Jackson County, Missouri, at Kansas City. Joseph A. Guthrie, Presiding Judge. Division No. 1. State of Missouri.

"To the Sheriff of Jackson County, Missouri, Greeting:

"Whereas it has been made to appear unto this court that William R. Nelson, as editor, owner and publisher of a certain daily newspaper called the Kansas City Star, published in Kansas City, Missouri, did, on the 26th day of January, 1913, print and publish in said newspaper an article concerning this court and the judge thereof, in words and figures as follows:"

(Then follows a copy of said publication previously copied.)

Said record continues as follows:

"And whereas, it has been adjudged by the said court now in regular session at Kansas City, Jackson county, Missouri, that said article has been printed and published as aforesaid by said William R. Nelson in contempt of court.

"We therefore command you to attach the said William R. Nelson so as to have his body forthwith before our said court here and now in session at Kansas City, Jackson county, Missouri, aforesaid, to answer of said contempt by him lately committed against said court; and further to do and receive whatever said court shall, in that behalf consider. Hereof fail not, and have you then and there this writ."

On the same day, to-wit, February 1, during the January term, 1913, of said court, the sheriff of Jackson county produced Mr. Nelson before said division of the court, and thereupon the court rendered a judgment against him finding him guilty of contempt, and ordered him to be committed to the jail of said county for one day. Said judgment is as follows to-wit (formal parts omitted):

"In Re William R. Nelson.

"A writ of attachment having heretofore issued out of this court against the defendant, William R. Nelson, for contempt committed against this court in printing and publishing of and concerning said court in The Kansas City Star, on the 26th day of January, 1913, the article hereinafter fully set out, which attachment was duly directed to the sheriff of the county of Jackson and State of Missouri, and returnable forthwith on the 1st day of February, 1913, to this court, now duly and regularly in session, and that during the January, 1913, term thereof, and the sheriff having returned that he attached the body of the said William R. Nelson, and had him in custody before the said court, and the said William R. Nelson having appeared personally before said court, and the matter involved in said alleged contempt having been duly inquired into by said court, and it appearing to the court that due notice and citation have been given to and served upon the said William R. Nelson personally, on the 28th day of January, 1913, requiring the said William R. Nelson to show cause, if any, why attachment should not issue against him for the contempt of this court in printing and publishing the said article in words and figures as follows:"

(Then follows a copy of said printed article.)

Continuing, said judgment is as follows:

"And, it appearing upon the hearing and trial of said proceedings duly and regularly held the first day of February, 1913, before this court, upon issue joined, that by the printing and publication of said article by

the defendant as aforesaid, the defendant falsely and wrongfully charged that upon the hearing of the proceedings in divorce recently had before the judge of this court, the judge thereof stated to the attorney representing the wife in such proceedings for divorce, that the man, that is to say, the husband involved in said suit, was not able to pay both attorney's fee and alimony to the wife, and that said court allowed and permitted the attorney for the wife to determine for the court that judgment and decree should be entered in favor of said attorney for his fee in said cause, and that judgment and decree in favor of the wife for alimony should be denied, and that the judgment and decree to that effect was by the court at the time made in accordance with the dictation of said attorney, and that the court did not decide and determine said matter then before the court for decision in accordance with the right and justice of the matter, but to the contrary, in accordance with the wish and determination of the said attorney representing the wife in said suit, and that the said court permitted the said attorney to decide a matter for the said court, that the said court was charged with the duty of deciding under oath of office of the said judge; and it appearing to the said court that the matters heretofore recited and contained in said article so printed and published by the defendant as aforesaid in its nature and effect charges this court with the wrongful and degrading act of expressing a willingness to decide, and in fact, deciding, an issue in a pending cause, as the court was told and instructed to do by an interested attorney rather than by what the court conceived to be the right and justice of the matter, and also charged the said court with the wrongful, unjust and oppressive act of deciding that a husband who was a party to a suit for divorce and who was unable to pay an attorney's fee prayed for in said proceeding, and at the same time pay the alimony to the wife prayed for therein, should at the request of such attorney, be per-

mitted to pay said fee, and that the wife should be denied provision for her support pending said litigation; and it appearing unto this court upon the hearing of this cause, that the said charges so made by defendant in said article against said court are false and untrue in matter and in fact, and it further appearing to said court that the act of the defendant in printing and publishing said article tends to scandalize this court, bring this court and the judge thereof into disrepute and public contempt, and to degrade said court in public opinion, and tends to destroy the respect of the people for the law of the land, and that the printing and publishing of said article as aforesaid by the defendant is a contempt of said court.

"It is therefore ordered, adjudged and decreed that William R. Nelson is guilty of the contempt alleged against him. Now, then, it is further ordered, adjudged and decreed that the said William R. Nelson be punished for such contempt by imprisonment in the county jail of Jackson county, Missouri, at Kansas City, and he is hereby directed to stand committed to the common jail of the county of Jackson, State of Missouri, at Kansas City, for a period of one day, and the sheriff of said county is hereby commanded to take charge of the body of him, the said William R. Nelson, and commit him into the custody of the marshal for the period of one day, unless sooner discharged by the court; and this order and decree shall be your warrant therefor."

On the same day a petition for *habeas corpus* in behalf of Mr. Nelson was presented to Hon. James M. Johnson, one of the judges of the Kansas City Court of Appeals, who issued the writ directed to the sheriff of Jackson county, commanding him to produce Mr. Nelson before said judge forthwith, which was done; and thereupon said sheriff was granted leave in which to make a return to the writ before Judge Johnson. Thereafter, to-wit, on February 3, 1913, motions were filed

251 Mo.—6.

with the Kansas City Court of Appeals and also with Judge Johnson to quash said writ on the ground that neither said court nor said judge had power to issue the same, for the reason that the petition asking for the writ was based upon constitutional objections which neither the court nor said judge had jurisdiction or power to hear or determine.

After due consideration of said motion to quash, Judge Johnson announced that he thought that the proceedings before him should be transferred to the Kansas City Court of Appeals, and he accordingly ordered the case transferred to that court. This was done and the court thereupon proceeded to consider the same, with the result that it found and adjudged that the petition for the writ presented issues which involved constitutional questions, the sole power to consider and determine which was vested in this, the Supreme Court of the State, and, therefore, said court ordered that the cause be transferred and certified to this court for determination.

Upon the cause reaching this court, the sheriff of Jackson county duly made his return to the writ of *habeas corpus,* which was in the usual statutory form, setting forth therein the judgment of Division No. 1 of the Jackson County Circuit Court, as his authority for holding the petitioner in custody.

When the cause reached this court, at the request of certain members of the Kansas City Bar, we appointed Edward E. Yates, Esquire, Honorable O. H. Dean, and Judge Willard P. Hall, well-known attorneys of Kansas City, to represent Judge Guthrie and the court over which he presided during the times herein mentioned.

The answer of the petitioner to the return of the sheriff is quite lengthy, covering about twenty-five pages of printed matter, and for this reason it will be omitted from this statement of the case; but we may add, that it sufficiently presents all the issues which

are presented and argued by counsel in their briefs filed herein.

Upon the filing of the answer tendering said issues, this court appointed Charles C. Crow, Esquire, a member of the Jackson County Bar, and an enrolled attorney and counselor at law in this court, to hear the evidence presented by the parties to this suit, and report the same to us within a certain time designated. Our learned commissioner duly qualified as such and entered upon the performance of his duties in that regard.

A great volume of evidence was introduced before the commissioner, taken down and reported by him to this court, as directed. It is too voluminous to be set out in this statement, the printed abstract of which covers about five hundred pages, which falls far short of what was introduced; and in passing we might add, that we heartily concur in the statement of the commissioner, to the effect that but little of this great mass of evidence is material to the issues of this case, and should not have been introduced.

Our learned commissioner made a finding of facts in the case, which he also returned to this court. It is quite lengthy and need not be set out here. However, among other things he found and reported that the article published in the Kansas City Star, of and concerning the Clevinger case, pending in Division No. 1, of the Jackson County Circuit Court, was substantially true, and was not contemptuous in character, and recommended that the petitioner should be discharged.

Upon the incoming of the report of our commissioner, the friends and counsel of Judge Guthrie and the court over which he presided, theretofore appointed by this court, duly filed exceptions to the report and findings of the commissioner.

I. Counsel for petitioner ask for his release from the custody of the sheriff of Jackson county, for four

reasons, which will be stated and considered in the inverse order stated in their brief.

Contempt
Per Se:
Admissibility
of Parole
Testimony.

The last reason assigned is that: "The statements published do not constitute a contempt, and if there was no contempt the petitioner should be discharged."

This is not only the position of counsel for petitioner, but it is substantially that of our learned commissioner, who found that the article complained of was substantially true and was not contemptuous.

However, after carefully reading the article complained of, the facts and circumstances surrounding the case of Clevinger v. Clevinger, the conduct of the parties thereto and the attorneys therein, the rulings of the court in connection therewith, together with the comments of the Star thereon, as stated in said article, compel us, unanimously, to withhold our concurrence from the findings and conclusion of the commissioner.

We are clearly of the opinion that the publication is neither literally nor substantially true, but is highly contemptuous to both the court and the judge thereof, as we will later point out.

The following facts are undisputed: that Judge Guthrie was the duly elected, qualified and acting judge of the circuit court of Jackson county, and was at the times complained of, presiding over Division No. 1, thereof; that during all the time herein mentioned, the petitioner was the owner and publisher of the Kansas City Star, a daily newspaper printed and published in Kansas City, Missouri; that there was pending in said division of said court a divorce suit, styled, Minnie Clevinger v. Claude Clevinger; that House & Manard, and W. J. Allen, were attorneys at law, and were the attorneys of the plaintiff in that case; that the two former filed motions in said case asking the court to allow her temporary alimony during the pendency of that

suit, and to them a reasonable sum for their services performed therein; that during the pendency of said motions, the plaintiff filed in said cause a written request that the same be dismissed, and upon the presentation of the motion for an allowance of temporary alimony and attorneys' fees, by counsel for plaintiff, counsel for defendant presented to the court said request of the plaintiff, that the suit be dismissed; that a contest was had over said motions and request, evidence heard, and the court found that no reconciliation whatever had taken place between the plaintiff and defendant to that suit, but upon the other hand, that defendant had procured the plaintiff to sign said request to have the suit dismissed for the purpose of assisting the defendant in defeating the payment of the attorneys' fees for the plaintiff; that as soon as the suit was dismissed he, the husband, intended to institute another suit for a divorce against his wife, the plaintiff in the pending case; and that after hearing the evidence and being fully advised in the premises, the court allowed said attorneys the sum of $40, and ordered that upon the payment of same the cause be dismissed.

It was the position of counsel for Mrs. Clevinger, the plaintiff in the divorce suit, that their fees were incidental to the suit, and that if the suit should be dismissed before they were paid, there was no means by which they could collect the same. The court took that view of the case below, and for that reason made the order dismissing the case upon the payment of the attorneys' fees allowed.

The friends of the court present that contention here, and insist that after a divorce suit is dismissed an independent suit will not lie against the husband or wife for the recovery of attorneys' fees earned by the attorney for the latter.

In passing, we will state that such seems to be the well-settled law of this State, as well as the great majority of the States of the Union, as shown by the

numerous authorities cited in brief of counsel, appointed as friends of the court; but be that true or not, it is undisputed that Judge Guthrie entertained that view of the law and so held.

In the meantime, the attorney, W. J. Allen, previously mentioned, asked for an allowance for services performed in said cause by him, for the plaintiff, and after hearing the evidence the court changed the previous order allowing $40 for attorneys' fees, and increased it to $60.

It was upon this state of facts and about which the article complained of was published.

In order to fully comprehend the intent and meaning of said publication (it being short) we will repeat it here, in order that it may be read in the light of the facts and circumstances about which it was written. It is as follows:

"PAY FEES BEFORE ALIMONY.

"THE LAWYERS MUST COLLECT FIRST
. JUDGE GUTHRIE DECIDES.

"*Three Attorneys Awarded $60 Each in a Suit for Divorce
Which Never Came to Trial—Reverses a Former Ruling
By Judge Goodrich.*

"If a woman brings a suit for divorce the case cannot be dismissed in the circuit court until the husband has paid her attorney his fee. Judge Guthrie made that ruling yesterday in favor of the divorce lawyers in the suit of Minnie Clevinger against Claud F. Clevinger.

"After Mrs. Clevinger filed her suit her attorney filed a motion asking the court to allow her alimony and attorneys' fee. When the motion was called a few days ago Mr. Clevinger appeared in court with a request signed by his wife that the suit be dismissed, as she wanted neither alimony nor attorneys' fee.

"FEES CLAIMED BY THREE.

"Her attorneys insisted that they be allowed their fee before the case was dismissed and asked that Mr. Clevinger be required to pay it, even though the wife desired to dismiss the suit. Judge Guthrie gave them a judgment for $40 against Mr.

Ex parte Nelson.

Clevinger. Then another attorney, making three attorneys in all, came into court and said he also represented Mrs. Clevinger. The matter was reopened on another motion and Judge Guthrie made an order yesterday increasing the allowance to the attorneys from $40 to $60. The new order provides that the suit cannot be dismissed by Mrs. Clevinger until the attorneys have been paid. Mr. Clevinger's attorney insisted that a claim for attorneys' fees in divorce suits was no more binding than suits to collect grocery bills or any other claims. Judge Guthrie decided differently. He also proved that the wife's suit was without merit.

"In a similar proceeding recently the judge told the attorney that the man was not able to pay both attorney's fee and alimony to the wife.

### "THE LAWYER DECIDED.

" 'Now, which shall I allow,' the court asked of the lawyer, 'the alimony to the woman or the fee to you?'

" 'Just make the judgment for the fee,' the attorney requested, and the order was so made.

"Judge Goodrich decided several months ago that a wife could dismiss her divorce suit at any time, regardless of whether the attorneys' fee had been paid. He refused to require the husband to pay the fee after a reconciliation had been effected. Judge Guthrie reversed Judge Goodrich's decision and there can be no reconciliations until lawyers have been paid. It is an important ruling in favor of the divorce lawyers.''

The principal question presented by this record is, was the publication of this article contemptuous of Division No. 1 of said court, and of the judge presiding therein?

We are unanimously of the opinion that this question must be answered in the affirmative; and judging from the mode of trial pursued by counsel for petitioner, they must have entertained the same conviction, for they were not willing to let the article speak for itself, but introduced much evidence for the purpose of showing that no contempt was in fact intended, notwithstanding its scandalous charges. This evidence was admitted over the objections of the friends of the court, and we suppose that it was upon this evidence that our learned commissioner found that the article was not contemptuous.

This is wherein our commissioner erred, for the reason that the meaning of this publication is clear and unambiguous upon its face.

The authorities seem to be uniform in holding that where a publication is unambiguous and clearly constitutes contempt, the intent is conclusively presumed, that is, the publisher is conclusively presumed to have meant what the publication clearly stated upon its face. [People v. Wilson, 64 Ill. 195, l. c. 212, 218, 220; In re Chadwick, 109 Mich. 588, l. c. 604; Telegram Newspaper Co. v. Commonwealth, 172 Mass. 294; Sturoc's Case, 48 N. H. 428; Fishback v. State, 131 Ind. 304, l. c. 314; In re Woolley, 11 Bush (Ky.), 95, l. c. 109, 111; People v. Freer, 1 Caines Rep. (N. Y.) 485; Rapalje on Contempt, sections 56 (p. 71), 121 (p. 167.)]

When the meaning of the publication is ambiguous and uncertain, usually the rule is that the sworn answer of the alleged contemner in a case of constructive contempt, denying any intention to traduce or vilify the court, is held to be conclusive in his favor, but this rule does not apply where the publication is unambiguous and clearly constitutes a contempt.

In the case of In re Woolley, supra, the Supreme Court of Kentucky had the question before it for consideration, and LINDSAY, J., who is recognized as one of the leading statesmen and jurists of the country, in speaking for the court said:

"We recognize, to the utmost reasonable limit of its application, the rule that a supposed contempt consisting in mere words, which are apparently intended to be scandalous and offensive, but which are at all susceptible of a different construction, may be explained or construed by the speaker or writer, and that upon his sworn disavowal of an intention to commit a contempt, proceedings against him must at once be discontinued. But this rule does not control where the matter spoken or written is of itself necessarily offensive and insulting. In such a case the disavowal of an intention to

commit a contempt may tend to excuse, but it cannot and will not justify the act. [The People v. Freer, 1 Caines (N. Y.), 484.]

"An intention to be offensive in manner may be disavowed, and the particular language used to make the charges or imputations may be withdrawn, but the effect of the paper or publication, the ideas conveyed, the charges and imputations made, may remain. We cannot escape the conclusion that respondent had reason to believe that the disavowal and retraction made by him would have the effect indicated and nothing more. . . .

"In the case in hand this court has been offered no explanation whatever. An ingeniously drawn statement and response, which at most amounts to but a qualified withdrawal of the offensive matter, unaccompanied by explanation or apology, is the only reparation which respondent is willing to make to this tribunal."

In the case of Fishback v. State, supra, the Supreme Court of Indiana said:

"If the article is *per se* libelous, making a direct charge against the court or jury, admitting of but one fair and reasonable construction, and requiring no innuendo to apply its meaning to the court, then it would be trifling with justice to say that in such a case the publisher could admit the publication, but deny that he intended the plain and unmistakable meaning which the language used conveys."

In Rapalje on Contempt, sec. 56 (p. 71), it is said: "Denying any criminal or disrespectful design in publications reflecting on proceedings before the court will not justify the party if they appear to the court to amount to a contempt."

In the case of In re Chadwick, supra, the Supreme Court of Michigan said: "Where the language is susceptible of two interpretations or constructions, and the party charged asserts under oath that he did not intend

the article to be construed as alleged in the innuendoes, he is purged of the contempt; but if the publication is fairly susceptible of but one construction, and its purport is to defame and degrade the court in the eyes of litigants and the public, his denial of any intended wrong does not operate to purge him of the contempt.''

So in People v. Wilson, 64 Ill. l. c. 212, the chief justice said: ''It need hardly be said that we cannot accept, as a reason for discharging the rule, the disclaimer in the answers of any intentional disrespect or any design to embarrass the administration of justice. The meaning and intent of the respondents must be determined by a fair interpretation of the language they have used. They cannot now escape responsibility by claiming that their words did not mean what any reader must have understood them as meaning.''

And in the same case (p. 219), McALLISTER, J., said: ''If the publication had the pernicious tendency which is claimed for it on behalf of the people, it is believed that no respectable authority can be found to the effect that a disavowal of a bad intent amounts to a justification. It would be contrary to the rule of law that every man must be presumed to intend the natural and necessary consequences of his own deliberate acts. In the case of The People v. Freer, above cited (1 Caines, 519), which was a proceeding like this, the point was expressly adjudicated by the Supreme Court of New York, KENT, J., delivering the opinion of the court. 'We cannot but perceive,' said that great judge, 'that the disavowal of any bad intent will not do away with the pernicious tendency or effect of publications reflecting on judicial proceedings which are before us.' ''

In the case of Telegram Newspaper Co. v. Commonwealth, supra, the Supreme Court of Massachusetts held that if the publication constituted contempt it was not necessary that the court which punished the contemner should have found that the intent existed. ''In

Cartwright's case, (114 Mass. 230), *ubi* supra, it is said by the court: 'But the jurisdiction and power of the court do not depend upon the question whether the offense might or might not be punished by indictment. . . . ''As regards the question whether a contempt has or has not been committed, it does not depend upon the intention of the party, but upon the act he has done.'' By TANEY, C. J., in Wartman v. Wartman, Taney, 362, 370.' If a person talk with, to, or send a statement to, a juror about a cause, during the trial of it, in such a manner that it may cause bias or prejudice in the cause, although the intent with which the person acted may affect the amount of his punishment, he cannot justify his conduct by showing that he had no evil intent, and knew no better.''

The same rule is applicable to libel. That is, if the publication is actionable *per se* the intent and malice are presumed as a matter of law.

In Farley v. Evening Chronicle, 113 Mo. App. 216, it is said: ''The proposition is maintained generally that though the publication of a libel was due to mistake, the publisher is answerable; and we see no reason why libelling a person on account of mistakenly identifying him with some one else should be an exception. That publication of a libel by mistake is no defense to an action for the damages caused, was held, under various circumstances, in the following decisions: Shepheard v. Whitaker, L. R. 10 C. P. 502; Fox v. Broderick, 14 Irish C. L. R. 453; Blake v. Stevens, 4 F. & F. 232; Loibl v. Breidenbach, 78 Wis. 49.''

Also in Moore v. Francis, 121 N. Y. 199, the court said, among other things, that ''it is not a legal excuse that defamatory matter was published accidentally or inadvertently, or with good motives and in an honest belief in its truth.''

In Ex parte Jones, 13 Ves. 238, 239, the Lord Chancellor (ERSKINE), in speaking of the defense set up for the printers that they were ignorant of the con-

tents of the contemptuous publication, said: "As to the printers, as Lord HARDWICKE observes, it is no excuse, that the printer was ignorant of the contents. Their intention may have been innocent; but as Lord MANSFIELD has said, the fact, whence the illegal motive is inferred, must be traversed; and the party, admitting the act, cannot deny the motive. The maxim *'Actus non facit reum, nisi mens sit rea,'* cannot be made applicable to this subject in the ordinary administration of justice as the effect would be that the ends of justice would be defeated by contrivance."

Also see 25 Cyc. 371-375, and authorities cited.

We are, therefore, clearly of the opinion that parol evidence was inadmissible for the purpose of showing the intention of the writer and publisher of this article, and that the action of the commissioner in admitting same was erroneous; and having disposed of that question, we will return to the article and see what is the clear meaning thereof, as expressed upon its face.

It clearly expresses, in substance, the idea that Judge Guthrie had made a startling and unheard of ruling in the case of Clevinger v. Clevinger; that said ruling was improperly made in favor of certain divorce lawyers (by insinuation, a questionable class, which, for money, is ever ready to stir up or add to domestic strife) against an unfortunate husband and wife, whose marital relations had been estrained; but who in calmer moments, when their better judgment had asserted itself, reconciled their differences, agreed to dismiss the divorce suit and start life anew, and who would have done so had it not been for that unrighteous judgment delivered by Judge Guthrie in Division No. 1 of the circuit court of Jackson county, which prevented their reconciliation and blasted their laudable hopes, at least, until the fees of said divorce lawyers should be paid; that after having allowed a fee of $40 to two lawyers, the court on motion of a third opened

up the case and allowed three fees to them of $60 each, which however was corrected as to the amount in the body of the article; that in another suit for divorce pending in his division of said court, Judge Guthrie unjustly decided that the lawyer's fees must be paid before alimony could be paid to the alleged wronged and destitute wife; that in said case Judge Guthrie permitted the lawyers of said destitute wife to decide which should be paid first, the attorney's fee or the alimony, which they unjustly decided in favor of themselves against their client, the destitute wife; and that notwithstanding said unrighteous decision, Judge Guthrie adopted and confirmed the same in favor of the lawyers and against the wife; that several months prior to the rendition of these judgments by Judge Guthrie, Judge Goodrich, a judge of another division of said court, in contrast to said unjust rulings of Judge Guthrie, declined to require the husband in a divorce suit pending before him, to pay attorneys' fees where the husband and wife had, as in the Clevinger case, reconciled their discordance, patched up their differences, and had agreed to dismiss said suit and resume their marital relations, which was done; but in the Clevinger case the husband and wife would be, by the unjust ruling of Judge Guthrie, made therein regarding the payment of the attorneys' fees, prevented from pursuing the same wise course.

While expressed in different language, yet the foregoing is precisely what the article says and means, and is the same meaning which Judge Guthrie gave to said article at the time of its publication; also which was placed upon it by his attorneys in the court below and by them in this court. In fact, that must be the meaning counsel for petitioner placed upon it, when read alone, because they deny that said article expresses the real meaning and intention of the writer thereof, and introduced much parol evidence to show

that the real meaning of the writer was not what the article upon its face purports to convey.

Moreover, counsel for petitioner, by implication at least, concede that that part of the article which states that Judge Guthrie decided that attorney fees in a divorce suit must be paid before alimony even though the wife be destitute, meant precisely what we have previously stated it means, and is therefore contemptuous if not true, for they allege and undertake to prove it was true, by saying that while those matters did not take place in Division No. 1 of said court, yet they did occur in Division No. 2, thereof, presided over by Judge Lucas, in another case tried by him something like a year previous to the occurrence of the matters stated in this article. Their position being that the various divisions of the circuit court of Jackson county constitute an entity, one court, and that whatever is done in one division thereof is done by the court, and that the division of the court in which it is done is wholly immaterial, and consequently the statements contained in the article in question, to the effect that Judge Guthrie, in Division No. 1 of the Jackson County Circuit Court, on January 25, 1913, decided in the divorce suit of Clevinger v. Clevinger that the attorneys therein were entitled to have their fees paid to them before the destitute wife of the defendant was entitled to have her alimony paid to her, and that Judge Guthrie permitted her attorneys to decide the question for him; that is, that after they, at his suggestion, decided it in their own favor and against the destitute wife, their client, he adopted their decision of the matter, are fully and legally established and proven to be true by showing that Judge Lucas, of Division No. 2, of said court, a year previous thereto, in the case of White v. White, did those things.

Concede without deciding the question, that in a strictly legal sense the various divisions of the circuit court of Jackson county are not separate and distinct

entities, within the meaning that the circuit courts of the respective circuits of the State are, nevertheless, for the purpose of this case, said divisions are just as separate and distinct from one another as are the courts of the various circuits of the State; and an article printed and published of and concerning one division of the court and the judge thereof, would have no more reference to any other division and the judge thereof, than would an article printed and published of and concerning the circuit court of Cole county and its judge have to the circuit court of Pettis county and the judge thereof.

This is true, for in such case the identity of the particular court and judge are the subjects of the publication, while in the case suggested by counsel for petitioner, the legal effect of the act done by the court or judge is the subject of inquiry, regardless of the particular division in which, or the judge by whom, it was performed.

And in justice to Judge Lucas we wish to state that we have read and carefully considered all the evidence introduced regarding the case of White v. White, alleged in the petitioner's answer to have been tried before him in Division No. 2, as well as his conduct and rulings therein, and after so doing, we have found that there is no evidence contained in this record which would warrant the following statement, *now* alleged to have been made by him in the trial of that case, viz.: "In a similar proceding the judge [Judge Lucas] told the attorney that the man was not able to pay both attorney's fee and alimony to the wife.

"The Lawyer Decides.

" 'Which shall I allow,' the court asked of the lawyer, 'the alimony, or the fee to you?'

" 'Just make the judgment for the fee,' the attorney requested, and the order was so made."

From that examination of the record, we have found that the evidence fails to show that said state-

ment, as charged, was made by either Judge Guthrie or by Judge Lucas.

The evidence in that case clearly shows that Judge Lucas's ruling therein was by the consent of Mrs. White, the plaintiff in that case, which fact gives emphasis to the falsity of the statements contained in the publication.

In fact, there is not a particle of evidence contained in this record, which I have been able to find, which tends to show that said article is true; the only palliating evidence found is that of Mr. Murphy, the author of the article, which is to the effect that he entertained no malice toward Judge Guthrie, that no contempt was intended for the court or for Judge Guthrie, and that the petitioner, Mr. Nelson, had no knowledge or information of the article until after it was published in the Star.

The authorities are so uniform in holding this class of publications to be contemptuous, that it would be a useless waste of time and space to quote from them. A list of them will be found cited in briefs of counsel accompanying the official report of the case.

While, as previously stated, this parol evidence was inadmissible for the purpose of showing no contempt was in fact intended in this and like publications, yet it does seem to me that that part of Mr. Murphy's testimony, which shows that he had no malice toward the court or Judge Guthrie, and that Mr. Nelson had no knowledge or information of the existence of the article until after its publication, was admissible in mitigation of the punishment which should be imposed for the offense committed.

I have been unable to find any authority supporting this particular view of the law, except the dicta stated in one or two cases previously cited. All the cases I have found hold generally that where a publication like this, which is contemptuous *per se,* is like a libelous article *per se,* the law presumes malice and that the libeled

party was damaged thereby, and that parol evidence is inadmissible to show that the publication was free from malice, either as a justification or in mitigation of damages. I can readily see a good reason for that rule in cases of libel, for in such cases it is difficult and often impossible to show the damages sustained, or the extent thereof, even though they may have been sustained, and without that rule a great injustice might be done the plaintiff.

But not so in contempt cases; the injury done thereby is not to a person who can be compensated by the payment of money for the damages sustained, but the injury done in such cases is to the court and State, and incidentally to the citizens generally thereof, and the punishment to be imposed is upon the guilty party for the purpose of punishing him for the crime committed and to deter him and all others from traducing and scandalizing the courts of the country and the judges thereof, which if tolerated, would bring them in disrepute and cause the citizens of the State to lose confidence in and respect therefor, as well as for the majesty of the law itself, all of which would inevitably lead to chaos and anarchy.

For this reason, I am of the opinion that the evidence was admissible, not in justification of the publication, but for the purpose of reducing the punishment, which in no manner would affect the efficiency of the law.

II. Counsel for petitioner next insist that he should be discharged from the custody of the sheriff, for the reason that "to constitute contempt, the publication, in a case of indirect contempt, must be in reference to a pending case." It is then contended that the case of Clevinger v. Clevinger had been dismissed prior to the publication of the article complained of. This contention is predicated upon

Case Pending.

the fact that at the time the court made the order allowing Mrs. Clevinger's attorneys the $60 for their services, it also dismissed the cause.

That is a clear misapprehension of the order. While it is true the motion for an allowance of attorney fees had been sustained and the allowance made, yet the order dismissing the case was made upon condition of the payment of the fees so allowed.

Clearly that was not a final disposition of the case. Such an allowance bears a relation to the case, akin to costs taxed therein; and the rule is that where a cause is dismissed upon payment of costs, it is always considered conditional, and such an order of dismissal is never an absolute disposition of the case until the costs are actually paid. [State ex rel. v. Thurman, 232 Mo. 130, and cases cited; Cummins v. Bennett, 8 Paige, 79; Simpson v. Brewster, 9 Paige, 245; Saxton v. Stowell, 11 Paige, 526.]

The allowance in that case not having been paid it was, according to the authorities cited, still pending and undisposed of at the time the article in question was published.

We are, therefore, of the opinion that this insistence of counsel for petitioner is not well grounded, and that he should not be discharged for the reasons there stated.

III.   The next contention of counsel for petitioner is, that "an inadvertent and unintentional misstatement of fact, or apparent misstatement, is not punishable as a criminal contempt, especially where, as here, the statement is true as to another division of the same court."

We practically disposed of the legal proposition here presented, by what we said in paragraph one of this opinion.

In the first place, the publication of an article which is contemptuous *per se,* is like an article libelous *per se.*

Mistakes and unintentional offense are no
True as to excuse, except in the former case, as I there
Another
Judge.          stated, and believe, that they should be con-
sidered in mitigation of the punishment to
be imposed in such cases. [See authorities cited in
paragraph one.]

And in the second place, the statements made in
the publication regarding the White case never in fact
occurred as stated, either in Division No. 1, before
Judge Guthrie, or in Division No. 2, before Judge
Lucas, or anywhere else in so far as this record shows.

We, therefore, rule this insistence against peti-
tioner.

IV. This brings us to the consideration of the last
ground presented by counsel for the petitioner's re-
lease. It is stated in the following language:

"Petitioner was deprived of his constitutional
          rights by the decision of Judge Guthrie,
Constructive rendered without a hearing, and by the re-
Contempt:
No Hearing. fusal to permit the introduction of compe-
          tent evidence in his defense."

The first impression produced by reading this con
tention of counsel is, that two grounds are stated there-
in for the release of petitioner, but upon reflection it
will be observed that it is but another way of stating
that the petitioner was deprived of his liberty without
due process of law; that is, he was tried and found
guilty in his absence, without an opportunity to intro-
duce any evidence, or otherwise to be heard therein.

The facts regarding that matter are as follows:

After reading the article complained of, Judge
Guthrie caused contempt proceedings to be instituted
against Col. Nelson, and caused a citation to be served
upon him requiring that he appear January 31, 1913, in
Division No. 1 of the circuit court of Jackson county,
Missouri, presided over by his Honor, Judge Guthrie,
and show cause, if any he had, why an attachment

should not issue against him for such alleged contempt. The petitioner, in response to said citation, appeared in said court, on said day, to show cause, etc., but by agreement of parties the cause was continued until February 1st, with the understanding, at least so far as petitioner was concerned, that all preliminary matters be disposed of. It seems, however, that Judge Guthrie did not have the same understanding of the preliminary matters that the petitioner had, for he testified that there were no preliminary matters to be disposed of, and therefore there was nothing to be done until February 1st.

Notwithstanding the cause had been set for February 1st, the petitioner, according to his understanding of the matter, filed his return to the citation on the morning of January 31st, and on the afternoon of that day Judge Guthrie procured the return, and examined the same with care, and without notice to the petitioner or his counsel took the same home with him that night and proceded to and did write an opinion therein, finding, from the citation and return, the facts of the case, and determined that the petitioner was guilty of contempt.

The opinion is quite lengthy, and no useful purpose would be served by setting it out; however, the opinion and concluding paragraphs thereof will later receive consideration.

When the cause was called for hearing on February 1st, the following took place:

Mr. Walsh, counsel for the contemner, offered to prove in detail the allegations of the return; whereupon Mr. Yates, the friend and counsel for the court, made this objection:

"Mr. Yates: To the offer of all these papers we object for the reason that nothing contained in the citation is based upon anything that occurred in connection with the Clevinger case, but to the contrary, is based solely upon the charge that certain things and occur-

rences recently took place in this court, and to the proof of those facts we direct the attention of counsel, and pray that we may meet the issue here involved squarely; and for the further reason that the offer as made in this case is incompetent, irrelevant and immaterial, and tends to prove no issue herein.''

''Mr. Walsh: Now, while I like always to respond to the cravings of my brother, or even his yearnings, nevertheless I say that it is necessary to the proper answer to this citation to put in the facts connected with the writing of the entire article.''

''The Court: Well, I think they are in a way immaterial, Mr. Walsh, and consuming time unnecessarily.''

Then follows an extensive offer by Mr. Walsh, of various kinds of evidence tending, as he claimed, to disprove contempt on the part of Mr. Nelson, all of which was objected to, objections sustained and exceptions were saved.

After Mr. Walsh had vainly insisted upon a hearing for his client, the court closed the case and proceded to read the opinion which had been prepared and written in the cause the night before, which after formal parts, the opinion begins as follows:

''It was perfectly clear to me, when I knew this matter was coming on for trial today, although the truth of the matter charged against this court was directly pleaded in the return of this respondent, that no testimony could be offered in the remotest way tending to prove the truth of the article in the respect wherein it is alleged in the complaint that it constituted a contempt of court.''

Continuing, the opinion reviews and construes the article at great length, and finds that it is contemptuous; also that the conduct and attitude of the Star for years past has been disrespectful and contemptuous toward the courts of Jackson county, and wound up by saying that:

"The defendant is pronounced guilty of the contempt as charged, and an order will go that his body be attached and brought before the bar of this court to receive such punishment as the court is prepared to impose upon him."

This opinion, however, was not read or mentioned until after the cause was *supposed to have been tried* on the morning of February 1st.

At the conclusion of the reading of the opinion, the court pronounced the judgment of guilt and imposed the punishment hereinbefore mentioned.

From this it conclusively appears that the petitioner was in reality tried by Judge Guthrie and found guilty on the night of January 31, 1913, with a mental reservation, if I correctly understand the position of his counsel, that if anything should transpire the next morning, February 1st, at the hearing, which would justify a change of the findings and the conclusions of the court, it would willingly and gladly make such changes therein as justice and right might require.

But as appears from the opening paragraph of the opinion previously copied, the Judge had made up his mind the night before the pretended trial, that nothing could happen to cause the court to change the findings and conclusions stated in the opinion, because he states therein that he knew "no testimony could be offered in the remotest way tending to prove the truth of the article," etc.; and in keeping with this statement in the opinion, the court, in a "wholesale" manner absolutely refused to permit the counsel for the petitioner to introduce any testimony whatever in support of the allegations contained in his return to the citation, and in fact gave him no hearing whatever, but proceeded to adjudge petitioner guilty and sentence him to one day in the county jail, in keeping with the conclusions reached in the opinion written the night before, but not delivered until after the pretended hearing was concluded. I use the words "pretended

hearing'' advisedly, because no disinterested and unbiased mind can come to any other conclusion from reading this record, but that the real trial took place on the night of January 31st, and that the proceedings had in court the next morning, February 1st, were solely for the purpose of breathing life and validity into the unquickened and void judgment written the night before.

This is conclusively shown not only by the entire proceeding had the next morning, but is emphasized and clarified by the following remarks of the court addressed to Mr. Walsh, in response to an opinion expressed by him regarding his right to ''show the facts connected with the writing of the entire article,'' viz.: ''The Court: Well, I think they are in a way immaterial, Mr. Walsh, and consuming time unnecessarily.''

Now we do not wish to be misunderstood regarding this matter. That is, we do not want to convey the idea that the court is passing one way or the other upon the materiality of the testimony mentioned, for that is not the question we are now considering, but the question is, was the petitioner given a hearing within the meaning of the State and Federal Constitutions before he was condemned, or was he in fact tried the night before with a contingent right, on his part, to have the findings and judgment modified or set aside in case he should convince the court that the findings and judgment were upon the facts improper, which, as we have previously shown by a quotation from said written opinion of the court, the court was satisfied the petitioner would not be able to make.

This conduct of the court was a plain violation of the following fundamental rule of right, viz.: ''He that answereth a matter before he heareth it, it is folly and shame unto him.'' [Proverbs, 18:13.]

''That no person shall be deprived of life, liberty or property without due process of law.'' [Sec. 30, Art. 2, Constitution of Missouri, 1875.]

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty or property without due process of law." [Sec. 1, 14th Amendment of the Constitution of the United States.]

These constitutional provisions are but different modes of expressing the fundamental right of man to a fair and impartial trial, be he innocent or guilty. This right was announced by Solomon centuries before the Christian era. All of those wise provisions of fundamental law are grounded upon right, and right is not grounded upon them. They are but the human guarantees that the God-given right, to all mankind, to life, liberty and property, shall not be taken from him without due process of law.

This is the best form of government given to man upon earth; but thank God we are promised a better one in the world to come, where everyone, great and small, shall be judged out of the book of life, "according to their works." [Revelation chap. 20, verse 12.]

Returning to earth.—The authorities are uniform in holding that these constitutional provisions are applicable to every form of procedure where the life, liberty or property of a person is sought to be taken from him, whether it be by the trial or appellate court, sitting alone or aided by a jury, upon information, indictment, citation or appeal, charged with a misdemeanor, felony, contempt of court, inferior or superior, or with any other violation of the law, where a judgment or conviction is asked taking from him his life, liberty or property.

Seemingly, the friends and counsel of the court do not seriously insist that the petitioner was actually tried and heard in his own defense before he was condemned, and deprived of his liberty within the meaning of said constitutional provisions, but insist that

notwithstanding that fact, he was not deprived thereby, of any of his legal rights, because as they contend, the record shows he was unquestionably guilty of contempt, and if he had been given a timely hearing the result would have been the same.

That may be true, yet counsel overlook the larger fact, namely; that even the most guilty are entitled to a fair and impartial trial before he can be legally pronounced guilty. A person may be guilty of the most atrocious crime, which may be known to hundreds and he may have proclaimed his guilt from the housetops, nevertheless, he must be accorded the same fair and impartial trial, according to the forms of law, that would be accorded to a king, prince or potentate. The assassins of Presidents Garfield and McKinley were tried according to the mandates of both the State and Federal Constitution, yet they were unquestionably guilty of murder; while in the case at bar, the petitioner, at most, was only constructively guilty of contempt, Mr. Murphy being the real party in guilt.

We will cite and quote from but a few of the cases bearing directly upon the question now before us.

In In re Clark, 208 Mo. 121, l. c. 147, this court held in a kindred case that a notice and trial are prerequisite to a valid judgment of conviction for an indirect or constructive contempt.

In discussing that question, in that case, Judge Lamm, in speaking for the Court in Banc, said: "If, on the other hand, the contempts charged in the judgment at bar, be indirect or constructive contempts, the contemner, under our statutes (Sec. 1618, R. S. 1899, supra), and under the common law, as will presently be pointed out, is entitled to notice, reasonable time and a hearing, or else he is condemned without due process of law as defined in the books. [See Womach v. St. Joseph, 201 Mo. l. c. 482, et seq.] As will be seen also, our statutes are but declarative of the common law in the foregoing respects, as in many others. Being so

declarative (in all respects pertinent here) we need pay little attention to questions relating to their constitutionality, suggested by the circuit attorney.''

So in the case of Barber Asphalt Paving Company v. Ridge, 169 Mo. 376, l. c. 384, the court, in the opinion written by GANTT, J., says that due process of law is synonymous with ''the law of the land,'' and states that the definition most often quoted and approved is that given by Mr. Webster in the Dartmouth College case, 4 Wheat. 518, which is as follows:

''By the law of the land is most clearly intended the general law; a law which hears before it condemns; which proceeds upon inquiry; and renders judgment only after trial.''

Professor McGehee, in his work on ''Due Process of Law,'' says at page 73: ''Justice requires that a hearing and an opportunity to present defenses must precede condemnation. Around this ideal of justice has grown up the constitutional conception of 'the law of the land' or due process of law, but the ideal was not confined to one system of jurisprudence, and was common to thoughtful men everywhere.''

These observations are clearly applicable to this case so that further discussion would be a supererogation of time and labor. [McClatchy v. Superior Court of Sacramento County, 119 Cal. 413, 39 L. R. A. 691, and cases cited; State ex rel. v. Judges Civil District Court, 32 La. Ann. 1256; Walter Cabinet Company v. Russell, 250 Ill. 416; Hovey v. Elliott, 167 U. S. 409; Mylius v. McDonald, 10 L. R. A. (N. S.) 198.]

Entertaining these views we are of the unanimous opinion that the petitioner should be discharged; and it is so ordered.

All concur, *Brown*, J., in last paragraph and result only.