No. 74,821

SHEILA ANN PAIDA, *Appellant,* v. JOHN PATRICK LEACH,
*Appellee.*
(917 P.2d 1342)

Opinion filed June 7, 1996.

*Jonathan L. Laurans*, of Shawnee Mission, argued the cause, and *Christopher T. Fletcher*, of Overland Park, was with him on the brief for appellant.

*Donna M. Manning*, of Manning & Smith, of Olathe, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Sheila Paida sued John Leach, her former husband and custodial parent of their two children, under the Protection from Abuse Act (Act), K.S.A. 60-3101 *et seq.*, seeking an order which would protect the children from abuse by Leach. The district court found no evidence of abuse and dismissed the petition. The district court also reaffirmed the order which placed the children in Leach's custody. Paida appealed. The case was transferred from the Court of Appeals to this court pursuant to K.S.A. 20-3018(c).

In this case a hearing was conducted at which Sheila Paida, John Leach (Leach), Jennifer Leach, and John Leach, Jr., (John) testified about an incident which occurred on May 23, 1995. Paida and Leach were married from 1978 to 1984. By the time of the alleged incident, the residential custody of their children, Jennifer and John, had been changed several times. They lived with Leach from 1992 until April 1995. In April, they began living with Paida when Jennifer told a school counselor that Leach had been abusive. On May 18, shortly before the incident at issue, residential custody of the children had been restored to Leach by order of the court. At the time of the incident, John was 13 years old and Jennifer was 15 years old.

John testified that the incident began after Leach refused to let him stay overnight with a friend. Leach had driven his son to school to play basketball with friends, but they found no one at the school. On the drive home, the son asked to spend the night at his friend's house. Leach refused to give permission. John described the argument that followed and that led to Leach's grabbing John's arms and twisting them behind his back, "[H]e just started pulling my arms up and started pulling it out of the socket." At that point, Jennifer entered the fray:

"Then my sister came out of the shower and said, 'What are you doing to my brother?' 'Go to your room.' That's what he told her. Then he let go of me once. Then he got me back in the arm lock and then he started in on my sister. Started throwing her in the walls and shoved soap in her mouth, cut her lip. Then she went to her bedroom and she was laying on the bed and my dad just took her arm and yanked her off of the bed. And I was standing in the corner like he told me to do. And I was just standing there crying. And he said, 'Oh, stop your whining.' Then the phone rang. He picked it up and started talking . . . . We just walked out the door to the neighbor's house."

Jennifer gave the following account of the incident:

"Something happened between my brother and my dad earlier, and I had no idea what was going on. He got home and I got in the shower and I heard yelling and like hitting walls, so I got out of the shower as fast as I could, put some clothes on, went outside and I saw my dad holding my brother with my brother's arms behind his back with this part of his arm up to his head, his head pulled back with his hand. I said, 'What are you doing?' Then I got pushed into the wall of the

bathroom. And I said, 'Wait a minute, what are you doing?' Then I kind of got loud with him and we went back and forth with cussing at each other. . . .

. . . .

"I called him an asshole. I told him I hated him. And I told him that he pissed me off. And I said it repeatedly, repeatedly. I was sent to my room. I went to my room. I laid down on my bed and he was—I couldn't really—I couldn't see what was going on between him and my brother, but I heard my brother yelling at him. He came in my room and started yelling at me about telling me I was worthless, I was a liar, I was manipulative, and he called me a manipulative bitch. He kept cussing at me. Then he took a bar of soap and pulled me off of my bed onto the floor and forced it into my mouth. And I· cut my lips up from my braces. And I said, 'Are you happy? Are you proud of what you're doing to me?' Somewhere in this time he said, 'Well, I'm going to make your life a living hell while you're here.' And I went to the bathroom. I was spitting blood into the sink. And I went to use the rest room and I shut the door. He came in there. He said, 'What are you doing?' I said, 'I'm going to the rest room.' He said, 'You have three seconds to get your ass out here and go into your room.' I said, 'Well, I would like to use the rest room first.' He said, 'Go ahead.' I said, 'Not with you standing there.' He said, 'You have no privacy anymore.' So I went into my room. He came in there and he started taking my things I needed like my alarm clock, my hair brush, my curling iron, and he put it in the living room where he was sitting. At this time my brother and him were still getting into it and I came out there and I started yelling at him to leave my brother alone. Then something happened with my brother hitting him—because my dad smacked him—in the stomach or some-thing, I'm not for sure about that, but I know my brother hit him. He kicked him in the shin. The telephone had rang and it was for my dad. And me and my brother were in our separate rooms. He was talking on the phone. I went into John's room, I said, 'Let's go.' He put on his shoes and we ran across the street and we called the police and our mom. They showed up, Med-Act showed up, checked my brother out and said he had a sprained shoulder. He told me to do something to my lips like keep ice on it and stuff."

Leach gave a slightly different version of his encounter with Jen-nifer:

"Well, he started making these gestures like this . . . like making punches and I was dodging, I was, you know, trying to move. He started laughing. He says, 'You're afraid, aren't you?' And I said, 'No, I'm not afraid, but it's normal to dodge.' I was starting to get upset myself. And he kept this on. And I stopped him from doing it, I grabbed a hold of him and I grabbed his arm, I pulled it around behind him with my arm across his chest, not around his neck, and he said, 'Okay, I will settle down.' At that time Jennifer come out of the bathroom and she was just in an uproar, she was screaming and she started the profanity and she said, 'John you don't have to do what he says.' And I said, 'Jenny, go to your room.' She

wouldn't listen. I said, 'Jenny, go to your room.' I grabbed her arm and headed her towards her room, got her in the room, shut the door. She immediately opened the door. I shut the door, she opened the door. I said, 'Jenny, stay in your room.' She got into more profanity by calling me a MF bastard and MF asshole at the top of her lungs. This went on. I said, 'I'm going to wash your mouth out with soap if you don't quit this. I'm going to wash your mouth out with soap.' She didn't stop, so I went into the bathroom and got a small piece of soap and I put it in her mouth. And it only got worse. Then John was in an uproar. And I went over and I sat in the chair, I just sat there. And John is threatening with, I'm going to kill you. I'm going to have—Mike is going to do this, Mike is going to do that. And Jenny is going on, it only got worse. And I just sat there. And I got on the telephone, a sponsor of mine called, I don't know, I can't figure that out that he called at that time, and they walked out of the house. And I just stayed there and talked on the phone and waited for the police to come. I knew they were coming."

Asked if he saw any blood in Jennifer's mouth after he put the soap in it, Leach testified: "I recall some on a tissue or something, but she was spitting—I mean, she was just spitting on the floor, she was spitting in the bathroom, she was just spitting everywhere at her leisure." In response to the question whether he saw any blood in the bathroom, he said: "Just a little where she was spitting, it was reddish."

The police were called from a neighbor's house where Jennifer and John went when they left Leach's house. Officer Kegin talked to them at the neighbor's house.

Jennifer told him that, when she refused to quit cussing, Leach shoved a bar of soap into her mouth. She said he cut her mouth and made it bleed. Officer Kegin took a look at Jennifer's mouth. He reported:

"She had a paper towel up to her mouth. The paper towel I saw didn't have any blood on it that I could see. I looked in her mouth and she did have braces. I couldn't see any cuts, large cuts, in her mouth. I didn't see any blood coming from her mouth at the time."

John was holding his arm when Officer Kegin spoke to him. John said that he had started an argument with his father, who threw him into a wall several times and then injured his arm by twisting it behind him. Officer Kegin did not see any injuries on John.

"[O]n the chance that there was some kind of personal injury or something," Officer Kegin called Med-Act to check the children.

He was present when they were examined. According to Officer Kegin, "they said they didn't really see anything on either child that was apparent that they could actually see any injuries that could be seen."

After considering the testimony and the report of Domestic Court Services staff, the district court dismissed the Protection from Abuse Act petition "on the finding of the Court that abuse as defined in K.S.A. 60-3012 did not occur." The district court also ordered that its order of May 18, 1995, which returned custody of both children immediately to their father, remain in effect.

Paida first argues that the district court arbitrarily disregarded undisputed evidence of abuse. The Act provides civil injunctive relief for victims of domestic violence. Under the Act, a parent may seek relief on behalf of his or her minor children by filing a petition which alleges abuse by a person with whom the child resides. K.S.A. 60-3104(a). Abuse is defined in part as

"the occurrence of one or more of the following acts between persons who reside together . . . :

(a) Willfully attempting to cause bodily injury, or willfully or wantonly causing bodily injury.

(b) Willfully placing, by physical threat, another in fear of imminent bodily injury." K.S.A. 60-3102(a) and (b).

The Act requires the district court to conduct a hearing "at which the plaintiff must prove the allegation of abuse by a preponderance of the evidence and the defendant shall have an opportunity to present evidence on the defendant's behalf." K.S.A. 60-3106(a). Although the legislation was enacted in 1979, the parties cite no reported decisions interpreting it, and we are unable to find any.

Paida disputes the district court's determination that no abuse occurred. The Act defines abuse as willfully or wantonly causing bodily injury. She asserts that willfulness is shown by Leach's admittedly "expend[ing] effort to force the soap into Jennifer's mouth as she struggled." She contends that bodily injury is established by evidence that Jennifer's mouth bled. Thus, the argument continues, relief was warranted because Leach was not putting soap in Jennifer's mouth by accident and Jennifer's lips bled from contact with her braces. In other words, Paida's theory is that injunctive

relief is warranted if the abuser was acting willfully and the victim sustained bodily injury, whether or not the alleged abuser willfully or wantonly *caused* bodily injury.

Willful conduct and wanton conduct are defined in PIK Civ. 2d 3.03 and 3.02. In *Folks v. Kansas Power & Light Co.*, 243 Kan. 57, 74, 755 P.2d 1319 (1988), the court approved the following definitions: "An act performed with a designed purpose or intent on the part of a person to do wrong or to cause an injury to another is a willful act." PIK Civ. 2d 3.03. "An act performed with a realization of the imminence of danger and a reckless disregard or complete indifference to the probable consequences of the act is a wanton act." PIK Civ. 2d 3.02. Incorporating these definitions into the definition of abuse in the Act, we see that willfully causing bodily injury is synonymous with intending to and succeeding in causing bodily injury. It is not the same as accidentally inflicting injury while intentionally performing some action. We also see that wantonly causing bodily injury does not require an element of intentional wrongdoing. See 243 Kan. at 74.

The theory under which relief was sought in the present case was not that Leach put a bar of soap in Jennifer's mouth in order to cause bodily injury. Instead, the allegation is that he caused bodily injury by putting a bar of soap in her mouth. There is no allegation in this case that Leach willfully attempted to cause bodily injury to either of the children. Thus, if abuse occurred, it must be based upon Leach's "wantonly causing bodily injury."

Wanton conduct without resulting bodily injury is not a basis for injunctive relief under the Act. K.S.A. 60-3102(a). Paida contends that the evidence established that Jennifer suffered bodily injury within the meaning of the statute. According to Paida, "[i]t is axiomatic that bleeding is not a natural bodily function which occurs in the absence of force or trauma being applied. But more importantly, even though a bodily injury can occur without the letting of blood, bleeding cannot occur without an injury." She provides no medical evidence to this effect, and it is an over-generalization that deserves little, if any, credence.

At the hearing, Jennifer was asked whether she sought medical attention for the injury which resulted from Leach's attemp to put the soap in her mouth. She gave the following testimony:

"A. When Med-Act came, they looked at me. They told me it should be fine and all that really happened was my braces cut my lip and it ripped it. I had a rip up here and down here. I wasn't really that bad, to tell you the truth, it was mostly my brother's shoulder.

"Q. Was any medical attention sought for his shoulder?

"A. They put like an ice pack on it. They asked him if he wanted to go to the hospital. My brother said he didn't want to go because he didn't feel like it, is what he said. And so they went ahead and left. They told him to keep ice on it for so many days, so many hours.

"Q. Do you know whether or not your mother ever took him to the doctor or anything?

"A. I don't—he quit talking about it about two days later. We were going to give him time to see how he was doing. And two days, three days, later he was fine . . . ."

Paida refers to the basis for the trial court's dismissing her petition as a negative finding. The court uses the term to indicate that the plaintiff, in this case Paida, did not sustain the burden of proof. The significance of this finding for the purpose of appellate review has been stated as follows:

" 'The effect of a negative finding by a trial court is that the party upon whom the burden of proof is cast did not sustain the requisite burden. Absent arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice the finding of the trial judge cannot be disturbed. An appellate court cannot nullify a trial judge's disbelief of evidence nor can it determine the persuasiveness of evidence which the trial judge may have believed.' *Highland Lumber Co., Inc. v. Knudson*, 219 Kan. 366, Syl. ¶ 5, 548 P.2d 719 (1976)." *Mohr v. State Bank of Stanley*, 244 Kan. 555, 567-68, 770 P.2d 466 (1989).

Paida contends that the district court disregarded undisputed evidence that Jennifer suffered bodily injury when Leach put a bar of soap in her mouth. The undisputed evidence is that Jennifer produced some blood from her mouth, that the amount was small, and that there was no sign of bleeding when the police arrived. Jennifer testified, "I was not that bad, to tell you the truth, it was mostly my brother's shoulder." On appeal, there has been no argument propounded that John sustained bodily injury as a result of Leach's twisting his arm behind his back. Paida treats the evidence about Jennifer's mouth as if it were self-evident that it constitutes bodily injury. She contends that this undisputed evidence,

as to Jennifer, constitutes abuse as a matter of law and, thus, the trial court arbitrarily disregarded it.

The Act does not contain a definition of bodily injury. The Act was patterned after a Pennsylvania law. Gottlieb & Johnson, *Reform in Kansas Domestic Violence Legislation*, 31 Kan. L. Rev. 527, 558 (1983). "Abuse" is defined in the Pennsylvania counterpart as including one household member "intentionally, knowingly or recklessly causing bodily injury" to another. 23 Pa. Cons. Stat. § 6102(a)(1) (1995 Supp.). Bodily injury is not defined in the Pennsylvania act, but § 6102(b) provides that undefined terms "shall have the meaning given to them in 18 Pa. C.S. (relating to crimes and offenses)." 18 Pa. Cons. Stat. § 2301 (1990) defines "bodily injury" as "[i]mpairment of physical condition or substantial pain." It is noted in the Official Comment to § 2301 that "[t]his section is derived from Section 210.0 of the Model Penal Code." 18 Pa. Cons. Stat. Ann. §§101 to 2700 (Purdon 1995 Supp.).

Our criminal code does not contain a definition of bodily injury. A conviction of aggravated kidnapping requires that bodily harm be inflicted upon the person kidnapped. K.S.A. 21-3421. In *State v. Royal*, 234 Kan. 218, 222, 670 P.2d 1337 (1983), we said:

"The State offered evidence that Ms. Harper sustained injuries. Reduced to one basic issue, the question is whether her injuries constituted 'bodily harm' as a matter of law. We discussed bodily harm in *State v. Taylor*, 217 Kan. 706, 713-15, 538 P.2d 1375 (1975), and we later quoted that discussion at length with approval in *State v. Sanders*, 225 Kan. 156, 158-59, 587 P.2d 906 (1978). Bodily harm has been defined as any touching of the victim against the victim's will, with physical force, in an intentional, hostile and aggravated manner, or the projecting of such force against the victim by the kidnapper. *State v. Taylor*, 217 Kan. at 714. This definition was developed from a California case and, as we noted in *Taylor*, the California court has significantly narrowed the definition of 'bodily harm' and now recognizes that some 'trivial' injuries, likely to result from any forcible kidnapping by the very nature of the act, do not constitute 'bodily harm' as that term is used in the aggravated kidnapping statute. Only unnecessary acts of violence upon the victim and those occurring after the initial abduction constitute 'bodily harm.' See *Taylor* at page 714 and *People v. Schoenfeld*, 111 Cal. App. 3d 671, 168 Cal. Rptr. 762 (1980). In the latter case, the California court held as a matter of law that minor cuts sustained by one of the victims during a successful escape effort, a scraped knee of one of the victims sustained while climbing down a ladder, and nosebleeds, fainting and stomach distress sustained by other victims did not constitute bodily harm."

Webster's New Twentieth Century Dictionary of the English Language 944 (2d ed. 1973) defines injury as "physical harm or damage to a person [or] property." Black's Law Dictionary 786 (6th ed. 1990) defines bodily injury as "[p]hysical pain, illness or any impairment of physical condition. 'Serious bodily injury' means bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." We do not know why the legislature used the term "bodily injury" rather than "bodily harm" in the Act. The parties provide no assistance in this regard. We assume it was because that term was used in the Pennsylvania act. However, since the terms appear to be synonymous, we do not attach any significance to the use of "injury" rather than "harm."

It is Paida's position that the legislature has defined abuse so that "if discipline in any form causes bodily injury, it is a form of discipline which merits an order of protection in favor of the victim." The legislature defined abuse in the context of the Act and focused on protecting spouses. There undoubtedly are instances when discipline of children escalates into domestic violence which would warrant relief under the Act, but discipline of children is not the chief evil at which the Act was aimed. The principal purpose of the legislation was to provide relief for battered spouses or cohabitants. Gottlieb & Johnson, 31 Kan. L. Rev. at 558-59. The discipline of children and the abuse of spouses share little common ground. Because these disparate family interactions fall under the same legislative enactment, the trial court can and should determine in light of all the circumstances in each individual case whether the plaintiff has shown abuse by a preponderance of the evidence. Those circumstances will include the age of the alleged victim and his or her relationship to the alleged abuser. Neither reason nor the limits clearly expressed by the legislature in the Act permits a trial court judge to overlook the infliction of bodily injury. However, the Act is not intended to dictate acceptable parental discipline or unnecessarily interfere in the parent/child relationship absent a clear need to protect the child. The State's intrusion should be limited to injunctive relief where parental conduct

causes more than minor or inconsequential injury to the child. Such a construction of the term "bodily injury" will prevent misuse or misapplication of the Act. Paida certainly has a point in arguing that it would be undesirable to have each judge freely imposing his or her own morality, own concept of what is acceptable, own notions of child rearing, or own standards for male-female relationships on the circumstances of the litigants. Contrary to her contention, however, defining bodily injury to exclude trivial or minor consequences and require either substantial pain or impairment of physical condition would lessen the potential for the exercise of unbridled trial court discretion. We conclude that bodily injury under the Act requires a finding of substantial physical pain or an impairment of physical condition.

In the circumstances of this case, the district court did not arbitrarily disregard undisputed evidence in reaching its determination that abuse had not been shown. It was alleged that Leach's putting the bar of soap in Jennifer's mouth caused bodily injury to her. There is no evidence of pain, certainly not substantial pain, nor is there any evidence of impairment of Jennifer's physical condition. Thus, no bodily injury within the meaning of the Act, as we interpret it, was shown. We need not, therefore, determine whether Leach's conduct was wanton.

Paida also claims the trial court's finding of no abuse was due to bias, passion, or prejudice. Testimony related to the protection from abuse petition was heard by the trial court on July 6 and July 11, 1995. At the end of the hearing on July 11, the trial court judge made extensive comments on the evidence and the circumstances of the parties. He concluded his remarks as follows:

"I am entering a journal entry and filing it here in open court at this time that for the reasons that I have stated in this hearing I am dismissing the Protection from Abuse Act claim and restoring the prior order of the Court as set forth in the journal entry of May 18th, which grants custody of both children to Mr. Leach. I am going to give to counsel for both of the parties two copies of this order, which is filed as of this moment and is an effective order as of this time."

The complete text of the order follows:

"On May 18, 995, July 6, 1995, and July 11, 1995, this Court held evidentiary hearing in this case and in Case No. 95C4568. These cases were consolidated by

the Court in its Order of May 18, 1995. After consideration of all of the evidence presented, including the report of Domestic Court Services staff prepared pursuant to this Court's orders of April 18, 1995, and April 27, 1995, and K.S.A. 60-1615, the Court enters the following orders:

"1. The Protection from Abuse Act petition is dismissed on the finding of the Court that abuse as defined in K.S.A. 60-3102 did not occur.

"2. The Court's custody orders as set forth in its Order of May 18, 1995, remain in full force and effect.

"IT IS SO ORDERED."

Counsel for Paida asked, "You had this typed up before the close of evidence and the closing argument; is that correct?" This colloquy followed:

"THE COURT: The document has been filed by me and signed by me following your closing argument. Certainly, judges are free to have draft opinions ready. I did have a draft opinion ready and I have now entered it for the reasons that I have stated on the record of this hearing.

"MR. LAURANS: So it's not your position that you were predisposed to this order by having it typed prior to the end of evidence today or my closing argument?

"THE COURT: You may file any motion that you believe is appropriate. You may file any notice of appeal that you believe is appropriate. The record is clear. I have stated on the record that I had a draft document that I prepared during this hearing and had typed up in case I decided to issue it. I have made that decision. I have now entered that order and filed it with the court here as of 6:41 p.m. this evening. It is now an order of the Court.

"MR. LAURANS: May I inquire of the Court if you also prepared a draft to the contrary in case you were persuaded the other way, or is this the only draft the Court prepared?

"THE COURT: You may not inquire as of that. Draft Court opinions are not a matter of public record, they are matters for the Court to consider. The only thing that is for you to consider are the rulings that I make on the record of the proceeding. My personal notes are not a public file and my draft opinions are not a public file. And I will not discuss that matter further. You are free to raise any matter you wish with any motion."

Paida relies on *Ex Parte Nelson*, 251 Mo. 63, 157 S.W. 794 (1913), for the proposition that the district court's drafting the order before hearing all the evidence requires reversal of the order denying recusal, vacation of the July 11 order dismissing the petition for protection from abuse, and remand for retrial before a different judge. Paida represents that *Nelson* is "virtually indistin-

guishable from the case at bar." We do not agree and find her reliance on *Ex Parte Nelson* is misplaced. William R. Nelson owned and published the Kansas City Star newspaper. He instituted a proceeding by habeas corpus seeking to be released from custody ordered by Jackson County Circuit Judge Guthrie upon his adjudging Nelson guilty of contempt of court for publishing a contemptuous article. Judge Guthrie set Nelson's punishment at one day in the county jail. The article falsely reported about attorney fee rulings made by Judge Guthrie in a divorce case. The Missouri Supreme Court unanimously concluded that publication of the article was contemptuous of the court and the presiding judge. 251 Mo. at 84. As a matter of law, therefore, Nelson's intent and malice were presumed as a matter of law. 251 Mo. at 88. Notwithstanding his guilt, Nelson argued that he should be released because he was tried and found guilty "without an opportunity to introduce any evidence, or otherwise to be heard therein." 251 Mo. at 99. In fact, that is precisely what had happened. After scheduling trial of the matter for February 1, Judge Guthrie wrote his opinion and order on January 31. Then when the parties appeared in court on the morning of February 1, Judge Guthrie, with the following words, refused to permit the introduction of any evidence: " 'Well, I think they [the facts connected with the writing of the entire article] are in a way immaterial . . . and consuming time unnecessarily." 251 Mo. at 101. Making clear that the question before it was not the materiality of the excluded evidence, the Missouri Supreme Court ordered that Nelson should be discharged on the ground that he was condemned without a hearing in violation of the constitutional guarantee of due process. 251 Mo. at 103-06.

*Nelson* is distinguishable from the present case on the obvious ground that Nelson was prevented from presenting any evidence. There is no contention that Paida was prevented from presenting evidence. In addition to refusing absolutely to hear any evidence, Judge Guthrie had written in the previously prepared opinion "that he knew 'no testimony could be offered in the remotest way tending to prove the truth of the article.' " 251 Mo. at 102.

Here, as in *Nelson*, the presiding judge had prepared his order before all the evidence was in. Here, however, it is undisputed that

Paida had presented all of her evidence before Judge Leben drafted his order.

With regard to precisely when the order was prepared, Paida asserts that a brief interruption of John's testimony was "the last opportunity for Judge Leben to have drafted the Journal Entry prior to the end of the case." In fact, the transcript of the July 11 hearing shows that a brief recess was taken *after* John's testimony. The brief interruption in John's testimony occurred after he finished testifying about the May 23 incident and only shortly before his examination was turned over to Leach's counsel. That brief recess coincided with the close of Paida's evidence. The only witness who testified after the recess was Leach. Leach testified on his own behalf, as respondent to the protection from abuse petition filed by Paida. His direct examination was conducted by the attorney who represented him, and he was cross-examined by counsel for Paida. The witnesses clearly were testifying on behalf of one party or the other, and Leach's testimony in his own behalf was the only testimony which was given after the recess. In other words, Paida's case was closed before the recess. Even if her assertion that the order was prepared during the brief interruption in John's testimony is credited, it is accurate to say that Paida's case with regard to the May 23 incident was closed by that time. Thus, her complaint is that the order was prepared after her evidence with regard to the central incident was concluded but before Leach testified. That is far different from a complaint that she was not permitted to present her evidence, particularly since Paida has the burden to prove that the alleged abuse occurred. The better practice for the district court would be to prepare the order only after the close of all the evidence. Simple common sense would dictate that to be the case, for appearance's sake if for no other reason. In the circumstances of this case, however, the timing of the district court's preparation of the order, although it may have conveyed the wrong impression, does not signal bias, passion, or prejudice which would require reversal.

Affirmed.