(945 P.2d 870)
No. 77,454

NICKI BARNETT and NICHOLAS BARNETT, *Appellees/Cross-Appellants,* v. CHARLES F. BARNETT, JR., *Appellant/Cross-Appellee.*

Opinion filed September 19, 1997.

*Ronald W. Nelson,* of Rose & Nelson, of Overland Park, for appellant/cross-appellee.

*William G. Howard,* of Law Offices of William G. Howard, of Olathe, for appellees/cross-appellants.

Before GREEN, P.J., MARQUARDT, J., and C. ROBERT BELL, District Judge, assigned.

GREEN, J.: Charles F. Barnett, Jr., appeals from a protection from abuse order entered against him. Nicki Barnett, Charles' ex-wife, moved for an order protecting Nicholas Barnett, the parties' 13 year-old-son, from abuse by Charles. In addition, Nicki asked the trial court to change residential custody of Nicholas from Charles to Nicki and to award her attorney fees in this matter. The trial court granted Nicki's requested relief, although the court reduced the amount of her claimed attorney fees.

On appeal, Charles challenges whether the evidence was sufficient to sustain the protection from abuse order. Given the fact

that Nicholas did not suffer substantial physical pain or physical impairment as required by *Paida v. Leach*, 260 Kan. 292, Syl. ¶ 1, 917 P.2d 1342 (1996), we reverse. Nicki cross-appeals, arguing that the trial court erred in denying her request for child support. Nicki further contends that the trial court erred in denying a portion of her claimed attorney fees. We disagree.

Nicki testified that she and Charles were divorced in 1990. Initially, Nicki had residential custody of Nicholas. In 1995, due to Nicki's emotional problems and Nicholas' desire to live with his father, Nicki and Charles agreed that Nicholas should live with Charles.

Charles testified that on the morning of June 3, he reminded Nicholas that he (Nicholas) had a psychologist's appointment at 3 o'clock that afternoon. Nicholas wanted to skateboard instead. Charles testified that he explained to Nicholas that it was particularly important that he keep the appointment because he was failing three subjects in school and disrupting classes. Nicholas had already missed one appointment. Charles testified that Nicholas stated that he would go either to summer school or to see the psychologist. Charles gave Nicholas permission to go out but told him that he had to be back by 2 p.m. Nicholas left home between 10:30 and 11 a.m. Between 6 and 6:30 p.m., Nicholas called home and asked to stay all night with a friend. Charles said, "[N]o, Nick, you were supposed to be back here at 2:00; you didn't show; you are in trouble. I want to come and get you."

In describing the discipline that he administered to Nicholas, Charles testified:

"A.  I went and picked him up and brought him home and came home and sat down in the chair. There is an ottoman opposite that chair, and I sat at the ottoman, and I said, Nick, I told you to be back here at 2:00; you weren't here. I didn't hear from you or anything.
"Q.  Did you yell at him?
"A.  No.
"Q.  Was your voice raised?
"A.  No. No, I was very calm, cool and [collected].
"Q.  Were you cursing at him?
"A.  No.
"Q.  Did you have a stick?

"A. Yes, I did have a switch. I beg to differ with that. It was a switch cut off of a tree.

"Q. Describe it, please.

"A. Oh, it was long, because he is five foot six, very fast, and the stick was long, because I thought he was running from me, and I wanted to inflict some punishment other than grounding him. And my plans—because it hadn't worked before, my plans were to switch his legs.

"Q. Did you switch his legs?

"A. I switched his legs.

"Q. What happened then?

"A. He had long corduroy pants on. He didn't feel a thing; looked at me and smiled and laughed. I was wanting some punishment, so I did. I struck him on the back about two or three times probably was all.

. . . .

"Q. Did he say anything to you while you were switching him?

"A. Yeah.

"Q. What did he say?

"A. He said, You fucker. This is fucking child abuse. This is fucking child abuse. He kept saying, This is fucking child abuse. And then he stood up and came for me and the switch, and I wasn't about to let him have the switch. And he was about to knock me off balance, so I didn't slap my—I don't recall slapping him. I did shove him back into the chair with my hand, my open hand on his cheek. Impossible to have left a mark.

"Q. What happened? Did you yell at him then?

"A. Yes, I did. He said this is fucking child abuse. I said this is not child abuse. This is parent abuse, and I repeated to him that he is failing in three subjects, he is causing disruptions in class every day. The counselor said he was out of control.

"Q. What did he do then?

"A. Well, he went to his room and said he was going to call his mother, started slamming doors and throwing things around and [I] heard a bunch of noise.

"Q. Did you go upstairs?

"A. The phone—no, I didn't. I just thought I would let him get rid of his frustrations or whatever it was.

"Q. Was he crying at that time?

"A. I don't think so. I don't think so. He was upset, of course.

"Q. Had you previously disciplined him like that?

"A. No, never.

"Q. How had you disciplined him before?

. . . .

"A. Grounding and just talking to him is how we tried to discipline him before, but he lied to us about turning in his homework, about doing his homework."

In explaining that previous methods of disciplining Nicholas had been ineffective, Charles testified:

"Grounding hadn't worked before. Talking to him hadn't worked. This has been going on for about a year with his mother as well as me. I felt that because he was giving me orders that he would either go to the summer school or [to] the psychologist was an attempt to control, take parental control away from me."

Although Charles testified on cross-examination that he intended to inflict some pain on Nicholas by switching him, he stated that he did not intend to injure him:

"Q.    What was your purpose in using a branch to discipline him?
"A.    Well, he is pretty good-sized, and I didn't think I could spank him, and I used a switch because I didn't think it would injure him much at all if I switched his legs. I just wanted him to feel a little pain for not showing up, for disobeying me and not showing up at 2:00 when I told him to."

Nicholas testified that although he told his father he would be visiting a friend and skateboarding, Charles reminded him that he (Nicholas) had a psychologist's appointment that afternoon and told him to return home by 3 p.m. Nicholas described the incident as follows:

"Q.    And did your dad say anything to you when you told him you were going out?
"A.    Yeah, he said be back by three.
"Q.    Why were you supposed to be back by three?
"A.    To go to an appointment.
"Q.    Had you and your dad talked about that previously that morning?
"A.    Yeah.
      . . . .
"A.    That morning when I woke up he—right when I was going out, he told me I had an appointment.
      . . . .
"Q.    What did you say to him?
"A.    I said, no, I am not. I said either that or summer school.
"Q.    And what did he say?
"A.    He said—I can't remember. I think he said both.
"Q.    Did he tell you what time the psychologist appointment was?
"A.    Yeah.
"Q.    What time was that?
"A.    I think it was around 3 or 3:30.

"Q. Did you call him up before that appointment to tell him where you were?
"A. No.
"Q. How does your father generally discipline you?
"A. Yells at me and then—
"Q. Has he ever physically spanked you before?
"A. When I was younger.
"Q. Could you describe the stick to the judge?
"A. I remember it being like a little shorter than a pool cue and, like, this thick around."

After his father picked him up, Nicholas described the discipline that he received when he arrived home as follows:

"Q. What happened when you got home?
"A. I sat in the chair in the kitchen, and I saw he was still in the garage, and I saw a stick in the front of the chair and then he came in.

. . . .

"Q. So your dad came in from the garage; what happened when he came in from the garage?
"A. What I can remember, he came in and then he picked up the stick and he started, like, yelling.
"Q. Do you remember what he said to you if anything?
"A. Not really. Just he knew I was—he said I know you are going to get in trouble and then I was grounded.
"Q. Did he call you any names?
"A. Yes.
"Q. Tell the Court what those names were.
"A. It was asshole and, like, worthless son of a bitch.
"Q. You say he beat you. What did he—I'm sorry. What did he do with the stick?
"A. He picked it up, and we started arguing and then he started to hit me.
"Q. Where did he hit you, Nick?
"A. In the front.
"Q. Nick, I know this is real difficult, but I am going to need you to tell the judge where he hit you.
"A. In the front, and I kind of blocked it. And then once he hit me in the back and that is when I tried to grab the stick from him, when I got up, and then [his] open hand hit me on the side of the face. And then he got the stick back and hit me in the back real hard.
"Q. When you say 'real hard,' did it hurt? How bad did it hurt, Nick?
"A. I was screaming.

. . . .

"Q. . . . When you say your father hit you with the stick in the front, can you tell the Court where he hit you?

"A.  He [swung] it and that kind of hit my arm while I was trying to defend myself.
"Q.  How many times did he hit you with a stick?
"A.  Around six or seven.
  . . . .
"Q.  Were you afraid, Nick?
"A.  Yeah.
"Q.  What were you afraid was going to happen?
"A.  He was going to hit me more.
"Q.  And when he hit you, that hurt? When he hit you that hurt?
"A.  [Yes.]
  . . . .
"Q.  Are you afraid of your dad, Nick?
"A.  Not really, just that day.
"Q.  Do you want to go back and live with him?
"A.  No."

Although Nicki did not witness the incident, she testified that Nicholas called and told her that Charles had beaten him with a stick. Nicki went to pick Nicholas up and then called the police. Testifying that Nicholas had welts on his back and a reddened area on his face, Nicki described these injuries as follows:

"Q.  Did you notice any visible injuries on him?
"A.  Yes, I did. The welts on his back and a mark on his face, red mark.
"Q.  Describe the welt on his back.
"A.  It was about, I don't know, six inches. It was raised and red. It was a welt. There were several smaller ones, one primary welt.
"Q.  Describe the other welts that you described.
"A.  They were smaller and red.
"Q.  Smaller?
"A.  Similar.
"Q.  Describe them.
"A.  I don't know. They are welts maybe an inch, two inch.
"Q.  How many?
"A.  I think there were two other ones.
"Q.  Okay. And you indicated that you observed something on his face?
"A.  It appeared to be a red bruise and kind of not a bruise but a red area on his face, dark.
  . . . .
"Q.  Did you take him to the hospital?
"A.  No, I did not.
"Q.  Did you take him to a physician?
"A.  No, I did not.

"Q.   Did you take him to any medical provider at all?
"A.   No, I did not.
"Q.   Did you give him any medication at that time?
"A.   He had a headache. I gave him I think some Tylenol."

A police officer described Nicholas' injuries as a 10- to 12-inch welt which was red in color and went from midway in his back to his side and a "red area around his eye that looked like it was beginning to bruise, but it had not started yet." The officer testified that Nicki and Nicholas refused his offer to call an ambulance because they "did not believe it was necessary."

Charles argues that the trial court erred in finding that a protection from abuse order was warranted. To address this question, we must review the trial court's findings of fact and conclusions of law, and our standard of review is as follows:

"Where the trial court has made findings of fact and conclusions of law, the function of an appellate court is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. Stated in another way, 'substantial evidence' is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion." *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 377, 855 P.2d 929 (1993).

Moreover, when this court considers conclusions of law, our standard of review is unlimited. See *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1991).

K.S.A. 60-3104 of the Protection from Abuse Act, K.S.A. 60-3101 *et seq.*, provides in part:

"(a) A person may seek relief under this act or any parent of or adult residing with a minor child may seek relief under this act on behalf of the minor child by filing a verified petition with any district judge of the judicial district or with the clerk of the court, alleging abuse by another with whom the person or child resides."

The applicable portions of K.S.A. 60-3102 provide:

"As used in this act 'abuse' means the occurrence of one or more of the following acts between persons who reside together, or who formerly resided together:
(a) Willfully attempting to cause bodily injury, or willfully or wantonly causing bodily injury.

(b) Willfully placing, by physical threat, another in fear of imminent bodily injury."

"The Act requires the district court to conduct a hearing 'at which the plaintiff must prove the allegation of abuse by a preponderance of the evidence and the defendant shall have an opportunity to present evidence on the defendant's behalf.' K.S.A. 60-3106(a)." *Paida v. Leach*, 260 Kan. 292, 296, 917 P.2d 1342 (1996).

Our Supreme Court recently interpreted the Protection from Abuse Act in *Paida*. Like the present case, the mother in *Paida* moved for protection from abuse on behalf of her two teenage children. The parents were divorced and the father had custody of the children. After an altercation with the son in which the father pulled the son's arm behind his back, the daughter interceded on her brother's behalf. By the daughter's own testimony, she yelled profanities at her father, who later washed her mouth out with a bar of soap. The son sustained a sore shoulder and the daughter had small cuts on her lips from her braces. After hearing the evidence, the trial court found that the plaintiffs had failed to sustain their burden of proof and dismissed the case. The mother appealed, arguing that the trial court had disregarded undisputed evidence that the children had been abused. In disagreeing with the mother's contention, our Supreme Court explained what the legislature intended when it used the phrase "bodily injury" in the Act. In seeking a proper definition for the words "bodily injury," the court quoted:

"Webster's New Twentieth Century Dictionary of the English Language 944 (2d ed. 1973) defines injury as 'physical harm or damage to a person [or] property.' Black's Law Dictionary 786 (6th ed. 1990) defines bodily injury as '[p]hysical pain, illness or any impairment of physical condition.' "Serious bodily injury" means bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 260 Kan. at 300.

Synthesizing several definitions, the court stated: *"We conclude that bodily injury under the Act requires a finding of substantial physical pain or an impairment of physical condition."* (Emphasis added.) 260 Kan. at 301. The court then applied this standard to the *Paida* facts and reasoned:

"It was alleged that [the father's] putting the bar of soap in [the daughter's] mouth caused bodily injury to her. There is no evidence of pain, certainly not substantial pain, nor is there any evidence of impairment of [the daughter's] physical condition. Thus, no bodily injury within the meaning of the Act, as we interpret it, was shown." 260 Kan. at 301.

The *Paida* court also emphasized that the legislature did not intend that the Act dictate parental discipline. Distinguishing between discipline and abuse, the *Paida* court reasoned:

"It is Paida's position that the legislature has defined abuse so that 'if discipline in any form causes bodily injury, it is a form of discipline which merits an order of protection in favor of the victim.'" . . . There undoubtedly are instances when discipline of children escalates into domestic violence which would warrant relief under the Act, but discipline of children is not the chief evil at which the Act was aimed. . . . *[T]he Act is not intended to dictate acceptable parental discipline or unnecessarily interfere in the parent/child relationship absent a clear need to protect the child. The State's intrusion should be limited to injunctive relief where parental conduct causes more than minor or inconsequential injury to the child."* (Emphasis added.) 260 Kan. at 300-01.

Applying *Paida* to the facts of the instant case, Charles argues that the evidence did not demonstrate that Nicholas suffered substantial physical pain or impairment of his physical condition. Charles argues that any pain Nicholas suffered was insubstantial and temporary and that the welts and reddening were temporary manifestations of reasonable disciplinary measures.

Nevertheless, Nicki argues that *Paida* is distinguishable from this case in that *Paida* dealt solely with K.S.A. 60-3102(a). Unlike *Paida*, Nicki argues that the present case was brought under both K.S.A. 60-3102(a) and (b). Although the trial court neglected to specify under which subsection it had determined that the abuse occurred, the trial court's decision dealt solely with the bodily injury aspect of K.S.A. 60-3102(a). Nevertheless, we will address briefly K.S.A. 60-3102(b) and the first prong of K.S.A. 60-3102(a).

Under K.S.A. 60-3102(b), there is no requirement of actual injury. The respondent's conduct must constitute a physical threat which causes the child to fear imminent bodily injury. Although Nicholas stated that he was afraid while Charles was switching him, he never stated that he was in fear of imminent bodily injury, as required by K.S.A. 60-3102(b). Because Nicki failed to produce

evidence that Nicholas was in fear of imminent bodily injury, the evidence was insufficient to find abuse under this subsection.

Next, we must determine whether the evidence was sufficient to find that Charles willfully attempted to cause substantial physical pain or physical impairment to Nicholas under K.S.A. 60-3102(a). Although the testimony was conflicting as to the size of the switch Charles used, the evidence was lacking as to whether Charles willfully attempted to cause substantial physical pain or physical impairment to Nicholas. To the contrary, Charles testified that he only wanted to inflict "a little pain" on Nicholas for failing to keep his scheduled appointment with the psychologist. Charles further testified that he did not intend to injure Nicholas, and Nicki has failed to produce sufficient evidence to the contrary.

Moreover, as to K.S.A. 60-3102(b) and to the first prong of 60-3102(a), Nicki does not argue on appeal that the evidence was sufficient for the trial court to find abuse under either of these theories. Even though an issue may be incidentally raised in a brief, if not argued, it will preclude our review of the issue. See *Brubaker v. Branine*, 237 Kan. 488, 490, 701 P.2d 929 (1985).

Finally, for Charles' conduct to constitute abuse, we must determine if Nicki proved that Charles either willfully or wantonly caused Nicholas to sustain a substantial injury. First, we will address whether Charles intended to cause a substantial injury to Nicholas. Nicki argues in her brief that "the evidence of [Charles'] wrongful intent is abundant." We disagree. As stated earlier, the evidence was insufficient to show that Charles intended to cause injury to Nicholas. Although Nicholas testified that Charles hit him six or seven times with the switch, Nicholas testified to feeling only one hard hit. This hit was to his back. From previous testimony, we know that this hit did not break Nicholas' skin. Consequently, we determine that Nicki failed to meet her burden on this issue.

Next, in discussing wanton conduct, the *Paida* court stated that "[w]anton conduct without [causing substantial physical pain or physical impairment] is not a basis for injunctive relief under the Act. K.S.A. 60-3102(a)." 260 Kan. at 297. Consequently, if the evidence fails to show that Nicholas suffered substantial pain or in-

jury, we need not address whether Charles' conduct was wanton. *Paida*, 260 Kan. at 301.

In finding that Charles injured Nicholas, the trial court stated:

"I would like to comment on what I have heard with regard to the allegations of abuse. I heard the father's testimony that the son disobeyed, refused to comply with lawful orders. Any minor child in the custody of a parent has the obligation to comply with the parent's lawful orders and direction. Whether the child agrees or not is not the point. Parent is responsible for the child likewise in orders to the child, but in this case father went too far.

*"Under the statute, discipline cannot involve the infliction of pain or any injury. And in this case we do have an indication of injury, and that is where he crossed the step beyond the line here.* I don't mean to minimize the problems parents have with teenage children. But there are ways to do it besides taking a stick and hitting a child causing welt and redness. That is not going to help the situation, and, as we found here, only makes the situation worse." (Emphasis added.)

These statements indicate that the trial court erroneously interpreted the statute to prohibit any discipline involving the "infliction of pain or any injury." In seeking to limit trial court discretion and intervention in the way parents discipline their children, the *Paida* court stated:

"Paida certainly has a point in arguing that it would be *undesirable to have each judge freely imposing his or her own morality, own concept of what is acceptable, own notions of child rearing, . . . on the circumstances of the litigants.* Contrary to her contention, however, defining bodily injury to exclude trivial or minor consequences and *require either substantial pain or impairment of physical condition would lessen the potential for the exercise of unbridled trial court discretion."* (Emphasis added.) 260 Kan. at 301.

Here, the trial court did not determine the extent of Nicholas' injury, and Nicki did not show that the discipline of Nicholas caused him substantial physical pain or physical impairment. Nicholas' welts and the reddening on his cheek were no more substantial than the daughter's cut lip and the son's sore arm in *Paida*. Moreover, Nicholas neither sought nor received medical attention, nor did he testify as to any enduring effects from the incident. Based upon the standards set out in *Paida*, the trial court's legal conclusion that "the infliction of pain or *any* injury" on a child would constitute abuse within the meaning of the Kansas Protection from Abuse Act was improper.

Next, Nicki appeals the trial court's ruling denying a portion of her requested attorney fees. Nicki argues that the attorney fee award was inadequate and, therefore, penalizes her for bringing the instant action. Nicki argues that the trial court's order granting $750 of the requested $5,005 was an abuse of the court's discretion. We disagree.

"The standard for awarding attorney fees, as well as an appellate court's review of such an award, is well established. In *Buchanan v. Employers Mutual Liability Ins. Co.*, 201 Kan. 666, Syl. ¶ ¶ 9-11, 443 P.2d 681 (1968), we stated:

'The trial court itself is an expert in the area of attorneys' fees and can draw on and apply its own knowledge and expertise in evaluating their worth.'

'The reasonable value of attorneys' fees rests within the sound judicial discretion of the trial court and its determination will not be disturbed in the absence of an abuse of discretion.'

'Appellate courts, as well as trial courts, are experts concerning the reasonableness of attorneys' fees and in the interests of justice may fix such fees when in disagreement with the views of the trial court.'" *City of Wichita v. B G Products, Inc.*, 252 Kan. 367, 372-73, 845 P.2d 649 (1993).

At the conclusion of the hearing, Nicki requested that the court rule on the issue of attorney fees. The trial court directed that Nicki's counsel submit an itemization of his time and charges incurred on the case. In response, Charles filed a detailed objection to the requested fees. Next, Nicki responded to Charles' response.

Contrary to Nicki's argument, the fact that the trial court did not award the full amount of the requested fees does not mean that the court failed to consider the time Nicki's counsel invested in the case or the difficulty and complexity of the issues involved. Although Nicki's counsel may have spent many hours in preparing this case, the petition was a simple form which merely required check marks in the appropriate boxes. In addition, the trial court limited the scope of the hearing. Finally, Nicki does not contend that the trial court's decision was guided by passion or prejudice. Therefore, despite the fact that a different judge may have awarded a different amount, either more or less, the record does not support a finding that the trial court abused its discretion.

Charles argues that the trial court erred in awarding any attorney fees because the underlying order was erroneous. We disagree. K.S.A. 60-3107(a)(7), which allows the trial court to award attorney

fees and costs to either party, has not been interpreted by our appellate courts.

The legislature stated its intent that the Act "be liberally construed . . . to facilitate access to judicial protection for the victims of domestic violence." K.S.A. 60-3101(b). If we were to construe the Act as suggested by Charles, this would place a chilling effect upon the bringing of borderline cases to the attention of the court system. We decline to adopt that reasoning. Furthermore, because K.S.A. 60-3107(a)(7) does not require a party's success as a condition to receiving an attorney fee award, the trial court did not abuse its discretion in awarding Nicki $750 for attorney fees.

Next, Nicki argues that the trial court erred in denying her request for child support. Although the trial court entered a protection from abuse order, the court did not order child support. Instead, the trial court instructed the parties to return to the hearing officer to resolve that issue. In allowing the trial court to award child support, the Act provides in K.S.A. 60-3107:

> "(a) The court shall be empowered to approve any consent agreement to bring about a cessation of abuse of the plaintiff or minor children or grant any of the following orders:
>
> . . . .
>
> (6) Ordering support payments by a party for the support of a party's minor child or a party's spouse. Such support orders shall remain in effect until modified or dismissed by the court or until expiration and shall be for a fixed period of time not to exceed one year. On the motion of the plaintiff, the court may extend the effect of such order for 12 months."

Nicki argues that the trial court's order that she return to the hearing officer for a modification is inherently prejudicial to her because she would be unable to recoup support payments for at least 2 months. Nicki reasons that K.S.A. 60-1610(a)(1), which provides for changes or modifications of child support, only allows modifications "retroactive to a date at least one month after the date that the motion to modify was filed with the court." Nicki was awarded custody under a temporary order dated June 4, 1996. The final protection from abuse order, which again granted Nicki custody but denied her request for support, was filed July 18, 1996. Therefore, she argues, she cannot recover child support for the

period from June 4, 1996, through July 18, 1996, and for at least 1 month after the date the petition for modification of support is filed.

Charles argues that the trial court did not have the necessary financial information of the parties to rule upon the issue of child support. We agree. If the trial court was provided with the parties' financial information, Nicki has failed to include such information in the record on appeal. " 'An appellant has the burden to designate a record sufficient to establish the claimed error. Without an adequate record, an appellant's claim of alleged error fails.' [Citation omitted.]" *McCubbin v. Walker*, 256 Kan. 276, 295, 886 P.2d 790 (1994). Consequently, Nicki's argument fails.

Affirmed in part and reversed in part.

BELL, J., concurring in part and dissenting in part: The majority has been led to the conclusion that the standard of review is a question of statutory interpretation and, therefore, a question of law over which this court has unlimited review rather than whether there is any evidence to support the trial judge's decision.

My search of the record on appeal has turned up nothing to indicate that the trial judge was not fully aware of our Supreme Court's definition of abuse as set forth by Justice Allegrucci in *Paida v. Leach*, 260 Kan. 292, 296, 917 P.2d 1342 (1996).

In fact, the record reveals the following exchange prior to the reception of evidence:

"THE COURT: All right. Counsel, as I understand the *Paida* decision the court has indicated we must have a finding here of impairment of a physical condition. Do you have any evidence that there is any physical impairment?

"MR. HOWARD: If I may, I would like to address that in some detail.

"First of all, with regard to the *Paida* decision, what counsel has not told you but what was apparent from that case is that the *Paida* claimants were proceeding only and solely under 60-3102(a), wantonly causing bodily injury.

"Now, again, I would like to emphasize for the Court that in addition to that clause, the Protection from Abuse Act also embraces 'Willfully attempting to cause bodily injury' or under subparagraph (b), 'Willfully placing, by physical threat, another in fear of imminent bodily injury.'

"THE COURT: Bodily injury is a term of art that is now defined by the *Paida* case.

"MR. HOWARD: In terms of when to proceed under bodily injury, the *Paida* case makes it clear that they are looking for impairment of physical condition or physical pain.

"THE COURT: Let me see if I understand what the evidence is intended to show here. You are not going to show that there was an impairment of a physical condition but rather pain? That is your—

"MR. HOWARD: No. I believe the testimony will establish both that there was physical pain suffered by Nicholas as well as impairment of a physical condition, at least on a temporary basis, because of his reaction to what happened on June 3.

"THE COURT: Let's go ahead and proceed with the evidence then directly on those issues."

Later the trial judge ruled that "in this case father went too far." The record can only be read to indicate noncompliance with the *Paida* standard by the negative inference of adding emphasis to the part of the trial judge's ruling in which he said, "Under the statute, discipline cannot involve the infliction of pain or any injury. And in this case we do have an indication of injury, and that is where he crossed the step beyond the line here."

I believe the proper standard of review was set forth by Justice, now Chief Justice, McFarland in *Wisker v. Hart*, 244 Kan. 36, 37, 766 P.2d 168 (1988). Although in that case the trier of fact was a jury, it should be noted that the following language was used by Justice Lockett in the nonjury case of *Lentz Plumbing Co. v. Fee*, 235 Kan. 266, 269, 679 P.2d 736 (1984):

"Where the trial court has made findings of fact and conclusions of law, the function of this court on appeal is to determine whether the findings are supported by substantial, competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. In determining whether a trial court's findings of fact are supported by the evidence, it is not the function of an appellate court to weigh conflicting evidence, pass on the credibility of witnesses or redetermine questions of fact. *Carpenter v. Riley*, 234 Kan. 758, 675 P.2d 900 (1984)."

I respectfully suggest that the brevity of the trial judge's factual findings with respect to the underpinnings of the abuse should not be a platform for this court to conclude that the trial judge did not understand the evidentiary requirements under the Protection from Abuse Act.

It appears to me that the finding of abuse in this case is more one of fact than of law and that the findings of the trial court should be affirmed.

I concur with the balance of the opinion.